# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

        Plaintiff,

vs.                                        No. CR 17-1371 JB

BRUCE SEDILLO, LOREN SABAQUIE,
and ROBERT GALLARDO.

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Void Search Warrant For DNA Sample or For Return of DNA Sample Pursuant to F.R.C.P. 41(g), filed July 6, 2017 (Doc. 29)("Motion"); and (ii) Defendant Sedillo's Opposed Motion to Join in Defendant Sabaquie's Motion to Void Search Warrant for DNA Sample or For Return of DNA Sample Pursuant to F.R.C.P. 41(g), filed July 31, 2017 (Doc. 35)("Motion to Join"). The Court held a hearing on August 3, 2017. The primary issue is whether Plaintiff United States of America, pursuant to two search warrants, unlawfully seized DNA samples from Defendants Bruce Sedillo and Loren Sabaquie to test against DNA collected from clothing identified as theirs that appeared similar to clothing worn by masked robbers, when the clothing has yet to be tested for viable DNA samples. The Court grants the Motion to Join and concludes that the United States did not unlawfully seize the DNA, because probable cause supports the warrants. Specifically, probable cause exists, because facts tie the robbers' getaway vehicle to Sedillo and Sabaquie, and facts tie the robbers' descriptions and clothing to Sedillo's and Sabaquie's descriptions and clothing associated with them. Moreover, based on an FBI agent's sworn statement and existing

precedent, it is sufficiently reasonable to infer that the clothing will yield relevant evidence to survive constitutional scrutiny. Accordingly, the Court will deny the Motion.

## FACTUAL BACKGROUND

The Court draws its facts from the Criminal Complaint, filed May 5, 2017 (Doc. 1)("Complaint"). On January 16, 2017, two men armed with handguns robbed Metro PCS, a cellphone and electronics distributor, in Albuquerque, New Mexico. See Complaint ¶ 3, at 1. Both of these men concealed their faces, the first with a purple bandana and the second with a Teenage Mutant Ninja Turtles[1] mask. See Complaint ¶ 3, at 1-2. Witnesses described the first man, later alleged to be Gallardo, as a skinny, black male who wore a black hooded sweatshirt, grey paisley pants, and blue latex gloves. See Complaint ¶¶ 3, 7, at 1, 3. Gallardo took electronic devices from the store and stuffed them into a green backpack. See Complaint ¶ 3, at 2. Witnesses described the second man, later alleged to be Sedillo, as a Hispanic male who wore a grey hooded sweatshirt, black pants, green and yellow shoes, and blue latex gloves. See Complaint at ¶¶ 3, 12, at 2, 5. Sedillo took cash from the store's cash register. See Complaint ¶ 3, at 2.

On January 21, 2017, a similar theft occurred when three men, one wearing a Ninja Turtles mask and all armed with handguns, robbed a 7-Eleven in Albuquerque. See Complaint ¶ 4, at 2. Witnesses described the first robber, later alleged to be Kshawn Cornwell, as a skinny black male, standing 6'3" who wore a black hooded sweatshirt, grey pants, black and white

---

[1]The Teenage Mutant Ninja Turtles are fictional anthropomorphic turtles trained in martial arts who defend New York City from, among other villains, a fictional ninja clan named "The Foot." Kevin Eastman & Peter Laird, Teenage Mutant Ninja Turtles, Mirage Studios (1984).

"Chuck Taylor"[2] style shoes, black gloves, and covered his face with a red bandana. Complaint ¶¶ 4, 7, at 2-3. The second robber matched Sedillo's description from the Metro PCS robbery in that witnesses described him as a medium build, Hispanic male standing 5'8" who wore a red and black hooded sweatshirt, a Ninja Turtle mask, and gloves. See Complaint ¶ 4, at 2. Witnesses described the third robber, later alleged to be Sabaquie, as a Hispanic male standing 5'6" or 5'7" who wore a black and grey hooded sweatshirt, black pants, white shoes, and covered his face with a red bandana. See Complaint ¶ 4, at 7. The three men fled the scene in a Scion box-style vehicle. See Complaint ¶ 4, at 7.

Over the next week, two more thefts occurred with similarly described men robbing another Metro PCS and a Wienerschnitzel. See Complaint ¶¶ 5-6, at 2-3. At both robberies, a man who matched Sedillo's description wore a Ninja Turtle mask and Nike high-top shoes. See Complaint ¶¶ 5-6, at 2-3. A man matching Gallardo's description robbed the Metro PCS while wearing grey paisley pants, a black hooded sweatshirt, and a white bandana over his face. See Complaint ¶ 6, at 3. An individual matching Sabaquie's description also robbed the Metro PCS, and wore a blue hooded sweatshirt, black pants, and white shoes. See Complaint ¶ 6, at 3. The robbers fled the Wienerschnitzel in a red, box-style vehicle. See Complaint ¶ 5, at 2.

On January 30, 2017, the Albuquerque Police Department received an anonymous tip that Sedillo had been robbing cellular telephone stores and riding around in a red, box-style vehicle. See Complaint ¶ 7, at 3. On February 2, 2017, a detective observed four men wearing hooded sweatshirts and armed with handguns rob a Verizon Wireless store. See Complaint ¶ 8, at 3.

---

[2]"Chuck Taylor" style shoes are a particular style of Converse All-Star shoe made popular by Chuck Taylor, a shoe salesman and basketball player for the Akron Firestones. Margo DeMello, Feet and Footwear: A Cultural Encyclopedia, at 81 (2009). In 1923, Converse added Taylor's name to the shoe's iconic ankle patch, and people began calling those All-Star shoes "Chuck Taylors, or Chucks." DeMello, Feet and Footwear: A Cultural Encyclopedia, at 81.

The men fled the scene in a car that matched the Wienerschnitzel robbery's getaway vehicle, a red Scion XB with New Mexico license plate "HYY834." See Complaint ¶ 8, at 3. Police pursued, but the car fled at high speed. See Complaint ¶ 8, at 4.

The police tracked the vehicle to an Albuquerque neighborhood and found Gallardo approximately two blocks away from where they later found the car. See Complaint ¶ 9, at 4. Gallardo is a black male, standing 6'3" with a slender build, and on that night he wore black and white shoes, camouflage shorts, and a purple shirt. See Complaint ¶ 9, at 4. Witnesses had described one of the Verizon store's robbers as a black man, standing 6'3" with a slender build, who wore a black-striped hooded sweatshirt, black and white shoes, a purple shirt underneath his sweatshirt, and gloves. See Complaint ¶ 9, at 4. The police also spotted Sabaquie in the neighborhood "walking away quickly from the area." Complaint ¶ 10, at 4. He wore a black hooded sweatshirt and white shoes. See Complaint ¶ 10, at 4. He matched one of the Verizon robbers' description. See Complaint ¶ 10, at 4.

Police discovered the red Scion vehicle in an apartment parking lot. See Complaint ¶ 11, at 4. After executing a search warrant, they uncovered masks and clothing matching the robbers' clothing from the Verizon heist. See Complaint ¶ 11, at 4. They also recovered two active cellular telephones: one had pictures of Sabaquie; the other "had a distinctive background picture that matched a photo that Bruce Sedillo had posted on his Facebook page." Complaint ¶ 12, at 5. Police also found Facebook photographs of Sedillo wearing the grey Nike high-top shoes that the Ninja Turtle masked robber wore at the Wienerschnitzel robbery. See Complaint ¶ 12, at 5.

The police subsequently searched an apartment where Sedillo and Gallardo lived with Cornwell. See Complaint ¶ 13, at 5. They found clothing similar to the apparel that the robbers wore during the various heists, including: white and grey Nike high-tops, green and yellow

shoes, grey paisley pants, a purple bandana, and a grey and black hooded sweatshirt. See Complaint ¶ 13, at 5. The police found the grey paisley pants and purple bandana in Gallardo's bedroom. See Complaint ¶ 13, at 5. The police discovered the white Nike high-top shoes, and green and yellow shoes, in Sedillo's bedroom. See Complaint ¶ 13, at 5. Sedillo's girlfriend told the police that the grey and black hooded sweatshirt found in the apartment belonged to Sabaquie, and that Cornwell wears black and white Chuck Taylor style shoes. See Complaint ¶ 14, at 5-6. She also told the police that she saw Gallardo and Sabaquie leave the apartment in the red Scion on the night of the Verizon robbery. See Complaint ¶ 15, at 6. Sedillo, Gallardo, and Sabaquie were subsequently arrested. See Arrest Warrant, filed May 11, 2017 (Doc. 11). Before the indictment, see Indictment at 1, filed May 24, 2017 (Doc. 13), Sabaquie's counsel indicated that Sabaquie would not consent to a DNA swab. See Motion ¶ 1, at 1.

## **FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure states: "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). The findings of fact in the Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes. These facts are drawn from the Complaint and the Application for a Search Warrant for Loren Sabaquie, filed June 23, 2017, No. 17-0543 (Doc.1)("Search Warrant").[3] The Court accepts these facts as true only for the purposes of this Motion.

---

[3]The Search Warrant citation is to Sabaquie's Search Warrant, but, for the relevant material, Sedillo's Search Warrant is identical to Sabaquie's. See Application for a Search Warrant (Sedillo), filed June 23, 2017 (Government Exhibit No. 2)("Sedillo Search Warrant").

**A.      The Robberies**.

1.      On January 16, 2017, two masked men took cash and electronic items without paying for them from the Metro PCS located at 3551 Gibson Blvd. SE, Albuquerque.  <u>See</u> Complaint ¶ 3, at 1-2; Search Warrant ¶ 3, at 1-2.

2.      The first man was black, stood 6'2", wore a black hooded sweatshirt, a purple bandana that covered his face, grey paisley pants, and blue latex gloves, and carried a green backpack with an orange interior lining.  <u>See</u> Complaint ¶ 3, at 1-2; Search Warrant ¶ 3, at 1-2.

3.      The second man was Hispanic, and wore a grey hooded sweatshirt, a Ninja Turtle mask, black pants, green and yellow shoes, and blue latex gloves.  <u>See</u> Complaint ¶ 3, at 1; Search Warrant ¶ 3, at 1.

4.      The men carried handguns.  <u>See</u> Complaint ¶ 3, at 1; Search Warrant ¶ 3, at 1.

5.      The first man's handgun was a chrome pistol with a black extended magazine. <u>See</u> Complaint ¶ 3, at 1; Search Warrant ¶ 3, at 1.

6.      The second man's handgun was a small black pistol.  <u>See</u> Complaint ¶ 3, at 2; Search Warrant ¶ 3, at 2.

7.      On January 21, 2017, three masked men robbed a 7-Eleven convenience store located at 10324 Menaul Blvd. NE, Albuquerque.  <u>See</u> Complaint ¶ 4, at 2; Search Warrant ¶ 4 at 2.

8.      The first man was black, stood 6'3", and wore a black hooded sweatshirt, a red bandana that covered his face, grey pants, black and white "Chuck Taylor" style shoes, and black gloves.  Complaint ¶ 4, at 2; Search Warrant ¶ 4, at 2.

9.      The second man was Hispanic, stood 5'8", and wore a red and black hooded sweatshirt, a Ninja Turtle mask, and gloves.  <u>See</u> Complaint ¶ 4, at 2; Search Warrant ¶ 4, at 2.

10. The second man held a handgun.  See Complaint ¶ 4, at 2; Search Warrant ¶ 4, at 2.

11. The third man was Hispanic, stood 5'6" or 5'7", and wore a black and grey hooded sweatshirt, black pants, white shoes, and a red bandana covering his face.  See Complaint ¶ 4, at 2; Search Warrant ¶ 4, at 2.

12. The three masked men fled from the business in a Scion style box car.  See Complaint ¶ 4, at 2; Search Warrant ¶ 4, at 2.

13. On January 25, 2017, three masked men robbed a Wienerschnitzel located at 2929 Carlisle Blvd. NE, Albuquerque, New Mexico.  Complaint ¶ 5, at 2; Search Warrant ¶ 5, at 2.

14. The first man was white, wore a black hooded sweatshirt, a Ninja Turtle mask, white Nike high-top shoes, and carried black bag with a strap.  See Complaint ¶ 5, at 2; Search Warrant ¶ 5, at 2.

15. The second man was Hispanic, wore a grey hooded sweatshirt, and a black mask.  See Complaint ¶ 5, at 2; Search Warrant ¶ 5, at 2.

16. The third man was black, and wore a checkered hooded sweatshirt and black and white "Chuck Taylor" style shoes.  Complaint ¶ 5, at 2; Search Warrant ¶ 5, at 2.

17. All three men carried handguns.  See Complaint ¶ 5, at 2; Search Warrant ¶ 5, at 2.

18. The three men fled the Wienerschnitzel in a red box-style vehicle.  See Complaint ¶ 5, at 2; Search Warrant ¶ 5, at 2.

19. On January 26, 2017, four masked men robbed the Metro PCS located at 3531 Gibson Blvd. SE, Albuquerque, New Mexico.  See Complaint ¶ 6, at 2; Search Warrant ¶ 6, at 2.

20.     The first man was black, stood 6'3", wore grey paisley pants, black and white shoes, a black hooded sweatshirt, a white bandana that covered his face, and carried a green backpack with orange lining.  <u>See</u> Complaint ¶ 6, at 3; Search Warrant ¶ 6, at 2-3.

21.     The second man was Hispanic, wore a black jacket, a Ninja Turtle mask, white or grey Nike high-top shoes, and carried a black bag slung over his shoulders.  <u>See</u> Complaint ¶ 6, at 3; Search Warrant ¶ 6, at 3.

22.     The third man was Hispanic, stood 5'6" and wore a blue hooded sweatshirt, black pants, and white shoes.  <u>See</u> Complaint ¶ 6, at 3; Search Warrant ¶ 6, at 3.

23.     The fourth man was black, stood 6'2", wore flower patterned sweatpants, white shoes with blue and orange soles, a black jacket, and carried a blue bag with white spots.  <u>See</u> Complaint ¶ 6, at 3; Search Warrant ¶ 6, at 3.

24.     All four men carried handguns.  <u>See</u> Complaint ¶ 6, at 2; Search Warrant ¶ 6, at 2.

25.     The first man held a chrome pistol with a black extended magazine.  <u>See</u> Complaint ¶ 6, at 3; Search Warrant ¶ 6, at 3.

26.     On January 30, 2017, an anonymous tipster told the Albuquerque Police Department that a man with the Facebook profile "OTF RJ Numero Cuatro" and a man named "Bruce Sedillo" were robbing cellular telephone stores and selling stolen telephones.  Complaint ¶ 7, at 3; Search Warrant ¶ 7, at 3.

27.     The anonymous tipster also stated that the men drove a red box-style car of an unknown make during the robberies.  <u>See</u> Complaint ¶ 7, at 3; Search Warrant ¶ 7, at 3.

28.     The anonymous tipster further said that the two men lived in an apartment located at the corner of Georgia St. SE and Gibson Blvd. SE, in Albuquerque.  <u>See</u> Complaint ¶ 7, at 3; Search Warrant ¶ 7, at 3.

29.     The Albuquerque Police Department identified "OTF RJ Numero Cuatro" as Robert Gallardo.  Complaint ¶ 7, at 3; Search Warrant ¶ 7, at 3.

30.     On Gallardo's Facebook account, there is a photograph of Cornwell holding a chrome pistol with an extended magazine and Gallardo.  <u>See</u> Complaint ¶ 7, at 3; Search Warrant ¶ 7, at 3.

31.     On February 2, 2017, an Albuquerque police detective spotted four men wearing hooded sweatshirts and masks approach a Verizon Wireless located at 5737 Menaul Blvd. NE, Albuquerque.  <u>See</u> Complaint ¶ 8, at 3; Search Warrant ¶ 8, at 3.

32.     The four men "entered the store and committed armed robbery."  Complaint ¶ 8, at 3; Search Warrant ¶ 8, at 3.

33.     One of the robbers was black, stood 6'3", wore a black striped hooded sweatshirt, black and white shoes, a purple shirt underneath his sweatshirt, and gloves, and carried a green backpack with orange lining.  <u>See</u> Complaint ¶ 9, at 4; Search Warrant ¶ 9, at 4.

34.     Witnesses described another one of the robbers as Hispanic, short, and thin.  <u>See</u> Complaint ¶ 10, at 4; Search Warrant ¶ 10, at 4.

35.     The men fled the store after robbing it in a red Scion XB with New Mexico License Plate "HYY834."  Complaint ¶ 8, at 3; Search Warrant ¶ 8, at 3.

36.     Police followed the Scion XB and attempted to conduct a traffic stop, but the car fled at a high speed.  <u>See</u> Complaint ¶ 8, at 4; Search Warrant ¶ 8, at 3.

37.     The red Scion XB entered a neighborhood near California St. SE and Zuni Rd. SE, in Albuquerque.  See Complaint ¶ 8, at 4; Search Warrant ¶ 8, at 4.

38.     Officers set up a perimeter around the neighborhood and searched for suspects. See Complaint ¶ 8, at 4; Search Warrant ¶ 8, at 4.

39.     Officers located Gallardo at the corner of Florida St. SE and Acoma Rd. SE, about two blocks away from where the red Scion XB was later found parked.  See Complaint ¶ 9, at 4; Search Warrant ¶ 9, at 4.

40.     Gallardo is black, stands 6'3", and on that night wore black and white shoes, camouflage shorts, and a purple shirt.  See Complaint ¶ 9, at 4; Search Warrant ¶ 9, at 4.

41.     Gallardo told the officers his name was "Ariel Bueno."  Complaint ¶ 9, at 4; Search Warrant ¶ 9, at 4.

42.     Officers also located Sabaquie, walking away "quickly" from the neighborhood. Complaint ¶ 10, at 4; Search Warrant ¶ 10, at 4.

43.     Sabaquie is Hispanic, short, thin, and on that night wore a black hooded sweatshirt and white shoes.  See Complaint ¶ 10, at 4; Search Warrant ¶ 10, at 4.

**B.      The Red Scion.**

44.     Police discovered the red Scion XB with New Mexico license plate HYY834 in an apartment parking lot at the corner of Cochiti Rd. SE and California St. SE.  See Complaint ¶ 11, at 4; Search Warrant ¶ 11, at 4.

45.     Officers saw, through the car's windows, masks, gloves, a red hooded sweatshirt, and a bag of unopened Verizon cellular telephones.  See Complaint ¶ 11, at 4; Search Warrant ¶ 11, at 4.

46.     Police sought a search warrant for the vehicle.  <u>See</u> Complaint ¶ 11, at 4; Search Warrant ¶ 11, at 4.

47.     After receiving the search warrant, police discovered all of the cellular telephones and cash missing from the Verizon store, a silver .25 caliber pistol, masks, clothing, two active cellular telephones, and a casino player's reward card with the name "Ariel Bueno" on it.  Complaint ¶ 11, at 4; Search Warrant ¶ 11, at 4.

48.     The police also discovered in the car a document for a Motel 6 hotel room rented from February 1, 2017, until February 2, 2017, to a woman named Annette Lucero.  <u>See</u> Complaint ¶ 11, at 5; Search Warrant ¶ 11, at 4.

49.     One of the active cellular telephones found in the car yielded several pictures of Sabaquie.  <u>See</u> Complaint ¶ 12, at 5; Search Warrant ¶ 12, at 5.

50.     The other active cellular telephone yielded a distinctive background photograph that matched a photograph Sedillo had posted on his Facebook page.  <u>See</u> Complaint ¶ 12, at 5; Search Warrant ¶ 12, at 5.

51.     Other photographs posted on Sedillo's Facebook page show Sedillo wearing white and grey Nike high-top shoes.  <u>See</u> Complaint ¶ 12, at 5; Search Warrant ¶ 12, at 5.

52.     The red Scion XB with New Mexico license plate HYY834 belongs to Victor and Susan Guerrero.  <u>See</u> Complaint ¶ 15, at 6; Search Warrant ¶ 15, at 6.

**C.     <u>The Apartment</u>.**

53.     Pursuant to a search warrant, police searched the apartment, where, according to the anonymous tipster, Sedillo and Gallardo lived.  <u>See</u> Complaint ¶ 13, at 5; Search Warrant ¶ 13, at 5.

54. Police discovered that two more people resided in the apartment: Cornwell and Garcia.  <u>See</u> Complaint ¶ 13, at 5; Search Warrant ¶ 13, at 5.

55. The police found in the apartment white and grey Nike high-top shoes, green and yellow shoes, grey paisley pants, a chrome pistol with a black extended magazine, a purple bandana, a black bag, and a grey and black hooded sweatshirt.  <u>See</u> Complaint ¶ 13, at 5; Search Warrant ¶ 13, at 5.

56. The police found the grey paisley pants, purple bandana, and chrome pistol with black extended magazine in Gallardo's room.  <u>See</u> Complaint ¶ 13, at 5; Search Warrant ¶ 13, at 5.

57. The police found the white Nike high-top shoes, green and yellow shoes, and black bag in Sedillo's room.  <u>See</u> Complaint ¶ 13, at 5; Search Warrant ¶ 13, at 5.

58. Garcia, Sedillo's girlfriend, told the police that the grey and black hooded sweatshirt belonged to Sabaquie.  <u>See</u> Complaint ¶ 14, at 5; Search Warrant ¶ 14, at 5.

59. Garcia also stated that Sedillo was able to borrow the red Scion XB from a woman named Sue.  <u>See</u> Complaint ¶ 15, at 6; Search Warrant ¶ 15, at 6.

60. Garcia saw Gallardo and Sabaquie leaving the apartment in the red Scion on the night of the Verizon robbery.  <u>See</u> Complaint ¶ 15, at 6; Search Warrant ¶ 15, at 6.

## PROCEDURAL BACKGROUND

On May 24, 2017, the United States indicted Sedillo on five counts of interference with commerce by robbery in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2.  <u>See</u> Indictment at 1, filed May 24, 2017 (Doc. 13).  On June 28, 2017, Sabaquie's and Gallardo's cases were merged with Sedillo's, and the United States filed a superseding indictment, indicting Sedillo on five counts of interference with commerce by robbery in violation of 18 U.S.C. § 1951(a) and 18

U.S.C. § 2, and Sabaquie and Gallardo on three counts of interference with commerce by robbery in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2. See Superseding Indictment at 1-3. The Indictment alleges that each "did unlawfully take and obtain currency from a cash register," and threatened employees at the various locations "with a firearm." See Superseding Indictment at 1-3.

1.      **The Search Warrant.**

Despite Sabaquie's counsel's representation that Sabaquie would not consent to a DNA swab, on June 30, 2017, Cristina Sandoval, an FBI agent, sought to extract a DNA sample from Sabaquie pursuant to a search warrant. See Motion ¶ 2, at 2; Search Warrant at 1. The Search Warrant application recounts the facts from the criminal complaint, see Search Warrant at ¶¶ 3-15, at 2-6, concludes that "there is probable cause to believe . . . Sabaquie committed armed robbery of [the] 7/11, . . . the Metro PCS on January 26, 2017, and Verizon," states "there is a probability that DNA and fingerprints will be found on the items collected during the search of the vehicle and apartment," and requests a "DNA sample by way of buccal swab" to compare the two DNA sets, Search Warrant ¶ 16, at 6. The Honorable Steven C. Yarbrough, United States Magistrate Judge, issued the Search Warrant, see Search Warrant at 1, and issued almost identical search warrants for Sedillo and Gallardo, see No. 17-0541, Application for a Search Warrant (Gallardo) at 1, filed June 23, 2017 (Doc. 1); Application for a Search Warrant (Sedillo) at 1, filed June 23, 2017 (Government Exhibit No. 2). Sabaquie's counsel did not learn of the Search Warrant until Sabaquie called and informed him that "an agent was at the Sandoval County Jail, seeking his DNA." Motion ¶ 2, at 2. After speaking with Sandoval, Sabaquie's counsel learned that "no evidence from any of the alleged crime scenes ha[d] been submitted for

DNA testing yet, but she wanted to submit Mr. Sabaquie's sample at the same time" as the DNA from the items collected to move the case quicker.  Motion ¶ 3, at 2.

    2.    **The Motion**.

On July 6, 2017, Sabaquie moved to void the warrant or for return of the DNA sample pursuant to rule 41(g) of the Federal Rules of Criminal Procedure.  See Motion at 1.  Sabaquie argues broadly that the Fourth Amendment of the Constitution of the United States of America bars a DNA sample collection.  See Motion ¶ 5, at 2.  According to Sabaquie, the Fourth Amendment precludes buccal DNA swabs, unless "there is probable cause to believe that the defendant's DNA will yield evidence of wrongdoing, not simply probable cause that a crime occurred."  Motion ¶ 5, at 2-3 (citing United States v. Biglow, 562, F.3d 1272, 1278 (10th Cir. 2009)).  From that legal principle, Sabaquie argues that, "[a]t this stage, the government cannot say with any degree of certainty, whether any DNA evidence will be developed from items that were taken pursuant to their investigation."  Motion ¶ 6, at 3.  Sabaquie, thus, concludes that, because DNA has not yet been developed from the items collected in the car and the apartment, there is no DNA profile to which Sabaquie's DNA can be compared, and, accordingly, there is no connection "between the alleged criminal behavior, and the [United States'] intended search."  Motion ¶ 6, at 3.

Sabaquie adds that, if the United States has already extracted Sabaquie's DNA, the Court should order the United States to return the sample pursuant to rule 41(g).  See Motion ¶ 8, 3-4.  Sabaquie asserts that the Court should order the DNA's return, because, if it does not, it "would encourage rather than deter the unlawful extraction of DNA," and "it would leave Mr. Sabaquie with no adequate remedy in law."  Motion ¶ 8 at 3-4 (citing Floyd v. United States, 860 F.2d 999, 1003-06 (10th Cir. 1988)).  Sabaquie concludes that there is a risk of DNA examiner bias,

and Sabaquie's DNA profile remains "irrelevant contextual information, unless and until it is independently determined that there is an evidentiary sample of adequate quality to compare him against." Motion ¶ 9, at 4.

**3.      The Response.**

The United States responded to the Motion on July 20, 2017, and argues that the Fourth Amendment is no bar to the Search Warrant for two reasons. See United States' Response in Opposition to the Defendant's Motion to Void Search Warrant and Return of DNA Sample at 2-3, filed July 20, 2017 (Doc. 31)("Response"). First, the United States asserts that there is a sufficient connection between the Sabaquie buccal swab it requests and the clothing it intends to test, because a person with knowledge, Sedillo's girlfriend, identified the clothing to be tested as Sabaquie's, and the clothing appears substantially similar to the robber's clothing as "can be seen in the surveillance video of the robberies." Response at 4. It further argues that a DNA comparison is needed, "because the nature of the crime involves suspects who concealed their identities." Response at 5. The United States adds that, because Sandoval provided "her assessment that DNA will be discovered" on the clothing, there is a sufficient factual connection between the robbery and Sabaquie to overcome any Fourth Amendment problems. Response at 5. It also asserts that, "[b]ased on the strong deference given to a magistrate's determination of probable cause, the Court should deny the defendant's motion." Response at 5.

Second, the United States argues that the Fourth Amendment allows searches that serve a practical purpose, such as in this case, where the United States needs to identify masked robbers. See Response at 5-6. Specifically, the United States avers that it gave a "detailed account[] of its investigation" into "robberies perpetrated by individuals who concealed their identities," and that the Search Warrant, thus, serves a practical and "common-sense" purpose of identifying the

robbers. Response at 6. The United States concludes that "probable cause is delineated in the four corners" of the Search Warrant, and "there is a nexus between the collection of the defendant's DNA and the suspected criminal activity." Response at 6.

4. **The Reply.**

On July 28, 2017, Sabaquie replied to the Response, and argues that the Search Warrant's facts do not provide a sufficient connection between the crime and Sabaquie to justify the warrant, and that there is a risk that the DNA tester will be unconsciously biased by testing Sabaquie's buccal DNA sample contemporaneously with the clothing's DNA sample. See Reply to Government's Response to Motion to Void Search Warrant for DNA Sample or for Return of DNA Sample Pursuant to F.R.C.P. 41(g) at 2-11, filed July 28, 2017 (Doc. 34)("Reply"). Sabaquie begins by noting that, after filing his Motion, the United States collected Sabaquie's DNA. See Reply ¶ 1, at 2. Consequently, Sabaquie withdraws his request to prevent collection, but preserves his request for his DNA's return pursuant to rule 41(g). See Reply ¶ 1-2, at 2-3.

First, Sabaquie contends that Sandoval's affidavit is defective. See Reply ¶ 3, 2-3. He explains that the Search Warrant requests to compare buccal swab DNA only "with evidence obtained during the search of the Scion XB with New Mexico license plate 'HYY834,'" but does not request to compare buccal DNA with DNA from items retrieved from the Apartment. Reply ¶ 3, at 2-3 (quoting Search Warrant at 6). According to Sabaquie, because the Search Warrant did not specify that Sabaquie's DNA would be compared with DNA from items retrieved from the apartment, the United States factual arguments vis-à-vis the apartment items are "misleading." Reply ¶¶ 2-3, at 2-3. Sabaquie further contends that the affidavit does not support at least one of the United States' arguments. See Reply ¶ 4, at 3. According to Sabaquie, the United States contends that a grey and black hooded sweatshirt found in the

- 16 -

apartment belongs to Sabaquie, and matches a grey and black hooded sweatshirt that a robber wore, but Sabaquie notes that the affidavit identifies Kshawn Cornwell as wearing the grey and black hooded sweatshirt during the robbery, not Sabaquie. See Reply ¶ 4, at 3. Sabaquie also attacks the Search Warrant more broadly by asserting that the United States does not establish facts "to support that the conclusion that there will be DNA on the items to be tested." Reply ¶ 5, at 3-4. He also attacks the Sandoval's statement that "[b]ased on my experience there is a probability that DNA . . . will be found on the items collected," because her experience does not encompass "the collection, analysis, or science of DNA or DNA transference." Reply ¶ 6, at 4. He continues that she has only been an FBI agent for a year, and the training and experience that she alleges in her affidavit is limited to "conducting surveillance, interviewing subjects, victims, and witnesses, writing affidavits for and executing search and arrest warrants, managing cooperating sources, issuing subpoenas, collecting evidence, and analyzing public records." Reply ¶ 6, at 4-5 (quoting Search Warrant at 1). He concludes that such experience "does not suggest that she could reliably predict the presence of testable DNA." Reply ¶ 6, at 4-5.

Sabaquie also asserts that "we know nothing about the items seized or their likelihood of producing evidence," because "we do not know how long the sweater had been out of Mr. Sabaquie's custody, under what circumstances and for how long someone other than Mr. Sabaquie was wearing the sweater," whether the sweater had been laundered, "and so on." Reply ¶ 7, at 5. He avers that there must be specific facts linking the intended search to relevant evidence, and without that link "no warrant should have [been] issued." Reply ¶ 8, at 5 (citing Illinois v. Gates, 462 U.S. 213, 239-40 (1983)). He concedes that there is arguably some link between the sweater and the telephone in the car, and Sabaquie, because there was a witness that

said the sweater belonged to him, and the telephone has photographs of him saved to it, but "it must be alleged, at minimum, that the proven physical connection is likely to yield testable DNA." Reply ¶ 10, at 5-6.

Second, Sabaquie argues that, if his DNA is developed contemporaneously with the sweater's DNA, a risk exists that the forensic analysis might be affected "by knowing about the prosecution's case." Reply ¶ 1, at 7-8. He contends that the President's Counsel of Advisors on Science and Technology has recently warned that, "[w]hen examiners know information such as the identity of a suspect, or a DNA profile, subjective interpretations of the DNA data can be irreversibly misinterpreted." Reply ¶ 1, at 8. He adds that several other academic groups have come to the same conclusion or have encouraged separate DNA testing. See Reply ¶ 2-3, at 8-9 (citing Strengthening Forensic Science in the United States: A Path Forward, National Academies Press at 185 (2009); Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories, Scientific Working Group on DNA Analysis Methods (October 14, 2017)). Sabaquie also argues that, if the samples are tested contemporaneously, contamination is also a concern, especially if the sample has little DNA to test. See Reply ¶ 4-5, at 10 (citing Rudin N., Imman K., An Introduction to DNA Analysis at 14 (2001)). He concludes by noting that the Supreme Court of the United States of America has also recognized DNA contamination concerns, and states that "there is absolutely no reason for this Court to endorse a practice that is at best a slight expedient, and at worst, an unconstitutional breach." Reply ¶ 6-7, at 11 (citing District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 82 (2009)(Alito, J., concurring)).

## 5. Sedillo's Motion to Join Sabaquie's Motion.

On July 31, 2017, Sedillo moved to join the Motion. <u>See</u> Defendant Sedillo's Opposed Motion to Join in Defendant Sabaquie's Motion to Void Search Warrant for DNA Sample or for Return of DNA Sample Pursuant to F.R.C.P. 41(g)(Doc. 29), filed July 31, 2017 (Doc. 35)("Motion to Join"). Sedillo argues that, because "only insignificant factual differences exist between Defendant Sedillo and Defendant Sabaquie," the Court should grant Sedillo's Motion to Join. Motion to Join at 1. In support of his contention that the two cases are highly similar, Sedillo says that Sedillo and Sabaquie are co-Defendants, Sabaquie's case was joined to Sedillo's, and neither parties' attorneys had notice of the Search Warrant. <u>See</u> Motion to Join ¶¶ 6-7, 16 at 2-4. Sedillo also notes the following facts that diverge between Sabaquie's case and Sedillo's: Sedillo was not a party to the discussion between Sabaquie's counsel and Assistant United States Attorney Presiliano Torrez on May 22, 2017, concerning Sabaquie's refusal to have his DNA collected; Sedillo told his counsel on July 5, 2017 that he had been fingerprinted at the jail a few days before his arraignment; and Sedillo's counsel confirmed that this fingerprinting included a DNA buccal swab. <u>See</u> Motion to Join ¶¶ 8-9, 16, at 3-4. He concludes by "respectfully request[ing] that the Court permit Defendant Bruce Sedillo to join" the Motion. Motion to Join at 4.

## 6. The Hearing.

The Court held a hearing on August 3, 2017. <u>See</u> Draft Transcript of Motion Hearing (taken August 3, 2017)("Tr.").[4] Sabaquie opened by arguing that <u>Schmerber v. California</u>, 384 U.S. 757 (1966) dispositively dealt with the issue before the Court. <u>See</u> Tr. at 2:11-24 (Fernandez). Sabaquie explained that, in that case, the Supreme Court held that "'the interests in

---

[4]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

human dig[nity] and privacy, which the Fourth Amendment protects forbid any such intrusions on the mere chance that [the] desired evidence might be obtained.'"   See Tr. at 2:17-20 (Fernandez)(quoting Schmerber v. California, 384 U.S. at 769-70).   Sabaquie expanded that the Supreme Court ruled that "'[i]n the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to [suffer the] risk that such evidence may disappear unless there is an immediate search.'"   Tr. at 2:20-24 (Fernandez)(quoting Schmerber v. California, 384 U.S. at 770).   From that Supreme Court holding, Sabaquie contended that Sabaquie's and Sedillo's DNA should be returned, because: (i) there is no chance that Sedillo's or Sabaquie's DNA will disappear between now and the time that the United States develops the DNA samples from the items; and (ii) there is insufficient probable cause to collect DNA where the United States has not yet developed the DNA from the other items.  See Tr. at 3:2-22 (Fernandez).

When the Court probed that Sabaquie and Sedillo were asking the Court to expand the Fourth Amendment "further than any Federal Court has ever gone before," see Tr. at 5:4-6 (Court), Sabaquie conceded that he is seeking to expand the Fourth Amendment, see Tr. at 10:25-11:1 (Fernandez), but also responded that the question presented rarely arises, because the United States typically motions to collect DNA under 42 U.S.C. § 14135A,[5] not pursuant to a search warrant, see Tr. at 5:7-16 (Fernandez).   Sabaquie also argued that Maryland v. King, 133 S. Ct. 1958 (2013) is inapposite, because "the rationale in [that case] was that [the DNA] was used for identification and classification," which is "very different from what [the United States is] seeking to use it [for here.]"  Tr. at 6:18-21 (Fernandez).  He added that the Supreme Court was not concerned in Maryland v. King with "contamination and development of evidence at the

---

[5]The relevant statute was recently recodified at 34 U.S.C. § 40702.

same time as [a] suspect's DNA," which is at issue here.  Tr. at 10:3-6 (Fernandez).  The Court

responded, however, that it was "skeptical that when [DNA] ends up in law enforcement['s

hands]" that the Constitution of the United States of America bars law enforcement from using

the DNA in more than one way -- its experience had been that law enforcement can "give [the

DNA] to other people, use it to investigate this crime, that crime.  It's not usually cabin[ed] the

way" that Sabaquie proposed.  Tr.  8:5-12 (Court).  Sabaquie countered that "practical concerns"

dictate a distinction in this case, because, when  developing a DNA profile "at the time of book

and classification," the DNA is presumably developed "so that it is useful for classification and

identification."  Tr. at 8:22-9:4 (Fernandez).  Sabaquie argued that, in contrast here, the DNA is

being developed "side by side with evidence," which risks contamination.  Tr. at 9:3

(Fernandez).  He added that collecting the DNA sample differs from routine collections of

fingerprints, because "you cannot contaminate a fingerprint the same way you can contaminate

DNA."  Tr. at 9:16-18 (Fernandez).

Drawing on state authority, Sabaquie added to his argument that developing DNA side-

by-side risks contamination.  See Tr. at 10:25-11:22 (Fernandez).  He noted that several state

cases construing the Constitution of the United States have determined that using the side-by-

side development process increases "the possibility of contamination."  Tr. at 11:21-22

(Fernandez).  Sabaquie argued that, in discussing contamination, his major concern is that "the

same lab technician or DNA examiner [will] touch both samples and inadvertently [] transfer

DNA from a suspect's sample to the evidence."  Tr. at 13:12-15 (Fernandez).  Sabaquie added

that, if technicians develop the DNA separately at different times, the danger that "the same lab

examiner touch[es] both samples is eliminated."  Tr. at 14:1-2 (Fernandez).

Turning to policy arguments, Sabaquie averred that there is a good deal of subjectivity that is introduced in analyzing DNA from evidence, because DNA from evidence is often "mixtures," not "pure samples." Tr. at 15:14-17 (Fernandez). He contended that "the scientific community is in full agreement that anything beyond a two person mixture is virtually impossible to untangle," that "[t]here is great evidence to show that most examiners can't even reliably distinguish a mixture where there is 3 or 4 [known contributors]," and that "the task of untangling is really impossible when you get complex enough." Tr. at 16:8-24 (Fernandez). Based on those considerations, Sabaquie argued that the way to test the samples "with integrity is you first decide whether or not this is a sample that can first be analyzed." Tr. at 17:6-7 (Fernandez). He argued that with the items collected -- a sweater on the bedroom floor and a cellular telephone -- there is going to be a mixture of DNA, so the best way to ward against error is to test the DNA only after determining whether there was a collectable sample from the items. See Tr. at 18:3-12 (Fernandez).

Sedillo then took the podium and argued that his case "is substantially identical" to Sabaquie's, but that there are a couple points he wanted to add. Tr. at 25:25 (Tallon). First, he argued that, unlike Sabaquie, "Mr. Sedillo did not acknowledge or concede probable cause." Tr. at 26:1-3 (Tallon). Second, he noted that the United States has brought to his attention nine items that it believes are associated with Sedillo: two bags, two pairs of shoes, three guns, and two cellular telephones. See Tr. at 30:11-21 (Tallon). Sedillo argued that there is an insufficient nexus between those nine items and the robberies to support probable cause to collect his DNA. See Tr. at 31:6-10 (Tallon). He added that, at the preliminary hearing, "Judge Yarbrough indicated that the evidence against Mr. Sedillo, which we are challenging, was fairly slender." Tr. 32:9-13 (Tallon). Sedillo also emphasized that the evidence's nature -- DNA -- is important,

because jurors hold DNA evidence in higher esteem then other evidence.  See Tr. at 33:11-17 (Tallon).

Regarding the risk of evidence contamination, the Court noted that it seemed unlikely that a constitutional rule could ever prevent all laboratory mistakes.  See Tr. at 34:1-5 (Court). Sedillo rejoined that a DNA contamination risk was heightened when taking swabs outside of the booking context, because the evidence here remains in an area that can be contaminated.  See Tr. at 34:23-35:13 (Tallon).  He added that a DNA mixture is highly likely here given that Sedillo had been living in the apartment with other people for months.  See Tr. at 36:2-14 (Tallon).  He argued that, given that cohabitation, Sedillo's DNA appearing on some of the items six weeks after the last robbery "must be factored into the reasonableness analysis."  Tr. at 36:2-14 (Tallon).

Sedillo concluded by attacking several loose ends.  See Tr. at 38:16-41:6.  First, Sedillo argued that the United States' argument that gathering the buccal swabs now serves a practical purpose of expediting the case is unpersuasive, because "almost any kind of investigative technique could be characterized as having a practical purpose[]."  Tr. at 38:16-18 (Tallon). Second, Sedillo emphasized that ruling in their favor would not affect thousands of cases, but affects only this one, because the case has distinct factual elements.  See Tr. at 39:10-17 (Tallon). Finally, Sedillo argued that Sandoval's inexperience should also sway the Court to return Sedillo's DNA.  See Tr. at 40:25-41:6 (Tallon).

The United States countered by broadly arguing that ruling in the Defendants' favor was impractical.  See Tr. at 48:19-52:24 (Torrez).  It contended that a contamination concern "is an issue that arises in every case" that DNA is used.  Tr. at 48:19-20 (Torrez).  The United States also argued that requiring the United States to wait to collect DNA is akin to requiring the United

States to wait to test a defendant's fingerprints until fingerprints collected from a crime scene are developed, but it noted that this is impractical, because developing fingerprints can take up to six months. See Tr. at 52:18-24 (Torrez). Although it admitted that DNA contamination might be a hurdle in terms of evidence admissibility, the United States argued that the contamination risk does not implicate the search warrant's constitutionality. See Tr. at 53:6-17 (Torrez).

It also argued that there is a sufficient connection between Sabaquie and Sedillo, and the items in the car, to establish probable cause. See Tr. at 53:19-25 (Torrez). First, it contended that Sabaquie was arrested blocks from the car soon after the robbery. See Tr. at 53:19-21 (Torrez). Second, it averred that agents found a cellular telephone with photographs that tied Sedillo to that telephone. See Tr. at 53:24-54:2 (Torrez). It also argued that there is a sufficient nexus between the apartment and the Defendants. See Tr. at 54:4-5 (Torrez). The United States contended that Sedillo lived at the apartment and that a witness identified clothing at the apartment that belonged to Sabaquie. See Tr. at 54:5-8 (Torrez). The United States concluded that, "once we establish the nexus" between the crime and the Defendants, "common sense tells us that if there is a possibility of DNA . . . we don't have to wait until the[re] is a determination that DNA exists." Tr. at 55:7-12 (Torrez). Regarding the proper inquiry, the United States argued that the Court must "look at the four corners of the warrant to determine whether or not probable cause exists," but that it does not know whether the Court is "allowed to go and look at the transcript of a preliminary hearing to see what the magistrate thought about probable cause." Tr. at 54:16-23 (Torrez).

The United States also responded to several contentions that the Defendants raised previously. See Tr. at 55:23-56:18 (Torrez). First, the United States contended that, although the Search Warrant states that it would compare the Defendants' DNA profiles with only items

found in the car, the limitation to the car does not preclude the United States from comparing the Defendants' DNA sample with items found in the apartment, because "what we're trying to do is . . . compare [the DNA profiles] to items of relevant evidence." Tr. at 55:23-56:7 (Torrez). Regarding whether Sandoval has proper credentials to draw an opinion about DNA evidence, the United States argued that "she has a Ph.D. in biochemistry" and that "the education that she does have would certainly be relevant." Tr. at 56:16-18 (Torrez).[6]

Sabaquie rejoined that, "until the[ United States] can show that [it] can develop DNA from [the evidence collected,] there is no ground upon which to say that [Sabaquie's] DNA will be evidence of anything." Tr. at 63:5-7 (Fernandez). He also conceded: "I think [the Court is] right [that] you don't create Fourth Amendment precedents on the risk [that] there [is] intentional mis[handling]," but that the Fourth Amendment can speak to "unintentional mishandling" of DNA samples. Tr. at 64:14-20 (Fernandez). Sabaquie also contended that, if the United States' only practical concern is that testing DNA at different times will slow the investigation down, "additional time is worth it" if "the risk is finding an innocent person guilty." Tr. at 65:16-20 (Fernandez). He added that "it would actually save [the United States] resources . . . if they only sought DNA from suspects when they knew they could compare it to something." Tr. at 65:20-23 (Fernandez). Sedillo concluded by arguing that the preliminary hearing gives the Court an opportunity to look at Sandoval's cross-examination, and that her cross-examination

---

[6]During the United States' presentation, the Court asked why the United States had sought the DNA pursuant to a warrant as opposed to via statute or motion. See Tr. at 43:4-9 (Court). The Court noted that "most of those motions run contested or they get granted," but by going through a magistrate judge first, the United States delayed the process as the motion would typically come before a District Judge eventually. Tr. at 44:9-16 (Court). The United States responded that it had applied for a warrant, because the superseding indictment had not yet returned, so the action was "still in my . . . magistrate phase." Tr. at 44:20-22 (Torrez). According to the United States, it thought it proper to go to the Magistrate Judge, because the federal system favors engaging the Magistrate Judge on "preliminary matters." Tr. at 44:22-24.

demonstrates why the Court should return Sedillo's and Sabaquie's DNA.  See Tr. at 67:14-22 (Tallon); id. at 68:16-21 (Tallon).

## LAW REGARDING THE FOURTH AMENDMENT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Fourth Amendment rights are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961); United States v. Rodriguez–Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment.").  "Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City v. Stuart, 547 U.S. 398 (2006)).  The Supreme Court has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    Fourth Amendment Searches.

A Fourth Amendment search occurs where, in an attempt to collect information, the government either trespasses on a person's property or violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 565 U.S. 400, 409 (2012).  The test "[a]t bottom" is meant to "'assur[e] preservation of that degree of privacy

against government that existed when the Fourth Amendment was adopted.'" <u>United States v. Jones</u>, 565 U.S. at 406 (alteration in original). Accordingly, "the *Katz* reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test." <u>United States v. Jones</u>, 565 U.S. at 409 (emphasis in original)(citing <u>Alderman v. United States</u>, 394 U.S. 165 (1969); <u>Soldal v. Cook Cty.</u>, 506 U.S. 56, 64 (1992)).

### a. **Trespass-Based Analysis.**

In <u>Florida v. Jardines</u>, 569 U.S. 1, 5 (2013), the Supreme Court explained that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" 569 U.S. at 5(quoting <u>United States v. Jones</u>, 565 U.S. at 406 n.3). "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." <u>United States v. Jones</u>, 565 U.S. at 408 n.5 (emphasis omitted)(quoting <u>United States v. Karo</u>, 468 U.S. 705, 713 (1984)). In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." <u>United States v. Jones</u>, 565 U.S. at 408 n.5. The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." <u>Bond v. United States</u>, 529 U.S. 334, 337 (2000). Moreover, the Supreme Court, in <u>Florida v. Jardines</u>, suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what

we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

569 U.S. at 7.

### b.    Katz v. United States' Reasonable-Expectation-of-Privacy Analysis.

"'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440 (1976)(quoting Hoffa v. United States, 385 U.S. 293, 301–02 (1966)).  The United States Court of Appeals for the Tenth Circuit has, thus, noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(citing United States v. Roper, 918 F.2d 885, 886–87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable."  Kerns v. Bd. of Comm'rs of Bernalillo Cty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, 3 F. Supp. 3d 1088, 1131 n.24 (D.N.M. 2014)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. 405, 409 (2005)(quoting United States v. Jacobsen, 466 U.S. 109, 123 (1984)).  The Supreme Court has, thus, recognized that, rather than determining whether law enforcement conduct was a search, it

sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533

U.S. 27, 32 (2001).

> In assessing when a search is not a search, we have applied somewhat in reverse
> the principle first enunciated in *Katz v. United States*. *Katz* involved
> eavesdropping by means of an electronic listening device placed on the outside of
> a telephone booth -- a location not within the catalog ("persons, houses, papers,
> and effects") that the Fourth Amendment protects against unreasonable searches.
> We held that the Fourth Amendment nonetheless protected Katz from the
> warrantless eavesdropping because he "justifiably relied" upon the privacy of the
> telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth
> Amendment search occurs when the government violates a subjective expectation
> of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33. The Supreme Court, thus, articulated the Katz v.

United States rule -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the

individual manifested a subjective expectation of privacy in the object of the challenged search,'

and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States,

533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source

outside of the Fourth Amendment, either by reference to concepts of real or personal property

law or to understandings that are recognized and permitted by society.'" United States v. Jones,

565 U.S. at 408 (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)). See United States v.

Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.)("To decide whether a

reasonable expectation of privacy exists, courts consider concepts of real or personal property

law."). In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment

context based on property law, "arcane distinctions developed in property and tort law between

guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. 128,

143 n.12 (1978).

A defendant maintains a subjective expectation of privacy when he or she "has shown that 'he sought to preserve something as private.'" Ysasi v. Brown, 3 F. Supp. 3d at 1109–10 (quoting Bond v. United States, 529 U.S. at 338). Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party. "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. at 351. The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect. In Smith v. Maryland, 442 U.S. 735, 740 (1979), for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which *Katz'* two-pronged inquiry would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

Smith v. Maryland, 442 U.S. at 740 n.5.

Under Katz v. United States' second step, the reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d 833, 838 (10th Cir. 2012)(citing United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)). The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). "Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values that the Fourth Amendment protects." United States v. Alabi, 943 F. Supp. 2d 1201, 1247 (D.N.M. 2013)(Browning, J.), aff'd 597 F. App'x 991 (10th Cir. Jan. 20, 2015)(citing California v. Ciraolo, 476 U.S. 207, 212 (1986)(explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment") quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'" LaFave, § 2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353). Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather on whether the expectation of privacy is justified or

legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. 170, 177-78 (1984)(citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  For example, in United States v. Place, the Supreme Court held that a drug-sniffing dog's "canine sniff" does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. 696, 707 (1983).  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could identify only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage.  It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through

the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to a chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122–24. A Federal Express employee and supervisor opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. They then called the Drug Enforcement Agency and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111–12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." 466 U.S. at 122. The Supreme Court, relying on <u>United States v. Place</u>, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest. Congress has decided -- and there is no question about its power to do so—to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
>
> . . . .
>
> Here, as in *Place,* the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

<u>United States v. Jacobsen</u>, 466 U.S. at 122–24.

c.    **DNA Searches.**

The Supreme Court recently considered whether collecting DNA via buccal swabs constitute a "search" under the Fourth Amendment.    Maryland v. King, 133 S. Ct. at 1968 (2013).    Noting that "[v]irtually any 'intrusio[n] into the human body'" will invade an area of personal security the Constitution protects, the Supreme Court held that "a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."    133 S. Ct. at 1968-69 (quoting Schmerber v. California, 384 U.S. at 770).    That conclusion did not, however, end the analysis.    Having determined that a buccal swab is a search, it turned to whether routinely collecting buccal swabs from arrestees as part of Maryland's intake procedure for serious offenses is reasonable under the Fourth Amendment.    See 133 S. Ct. at 1966, 1969 ("As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is reasonableness.")(citations omitted).    While the Supreme Court generally "prefer[s] some quantum of individualized suspicion" when analyzing whether an intrusion is reasonable, the Supreme Court noted that "the Fourth Amendment imposes no irreducible requirement of such suspicion" and concluded that, in the buccal swab context, no such individualized suspicion is required.    133 S. Ct. at 1969-70.    It further concluded that whether a routine buccal swab of an arrestee is reasonable under the Fourth Amendment "requires a court to weigh 'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'"    133 S. Ct. at 1970 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)).    Turning to that balancing test, it determined that routine buccal swabs of arrestees serves a well-established legitimate governmental interest of "identify[ing] the persons and possessions they must take into custody" upon arrest.    133 S. Ct.

at 1970. The Supreme Court then explained the importance of ascertaining an arrestee's identity:

> An individual's identity is more than just his name or Social Security number, and the government's interest in identification goes beyond ensuring that the proper name is typed on the indictment. Identity has never been considered limited to the name on the arrestee's birth certificate. In fact, a name is of little value compared to the real interest in identification at stake when an individual is brought into custody. It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features.
>
> . . . .
>
> A suspect's criminal history is a critical part of his identity that officers should know when processing him for detention. It is a common occurrence that "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals. Hours after the Oklahoma City bombing, Timothy McVeigh was stopped by a state trooper who noticed he was driving without a license plate. Police stopped serial killer Joel Rifkin for the same reason."

133 S. Ct. at 1971 (quoting <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 566 U.S. 318, 334 (2012)). The Supreme Court acknowledged that DNA is not itself "evidence of any particular crime," but it is nonetheless "useful to the police because it gives them a form of identification to search the records already in their valid possession." <u>Maryland v. King</u>, 133 S. Ct. at 1972. After examining some other legitimate interests the state had in the arrestee's DNA, the Supreme Court weighed the arrestee's privacy interest and concluded that an arrestee's expectations of privacy, after taken into police custody, were diminished in scope, and that "the intrusion of a cheek swab to obtain a DNA sample is a minimal one." 133 S. Ct. at 1977-78. The Supreme Court, thus, concluded that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure." 133 S. Ct. at 1980.

2. **Search Warrants Require Probable Cause.**

The Fourth Amendment requires that a Magistrate Judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant. United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M.2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983), aff'd, 749 F.3d 900 (10th Cir. 2014)). Probable cause requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral–Corral, 899 F.2d 927, 937 (10th Cir.1990). The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x. 815, 821 (10th Cir.2006)(unpublished)(quoting Illinois v. Gates, 462 U.S. at 238).[7]  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir.

---

[7]United States v. Reed is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein). In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause." United States v. Reed, 195 F. App'x. at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. at 236, 238–39. This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-106 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s"). Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d 1201, 1253 (D.N.M. 2013)(Browning, J.)(citing United States v. Leon, 468 U.S. 897, 914, (1984)). The court should

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Reed, United States v. Thompson, United States v. Soza, United States v. Rollins, United States v. Fisher, and United States v. Young have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

not defer to a Magistrate Judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the court should not defer to a Magistrate Judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x. at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

        **3.**        **Search Warrants Require Particularity.**

The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Supreme Court has explained that the "manifest purpose" of the particularity requirement is "to prevent general searches."  Maryland v. Garrison, 480 U.S. 79, 84 (1987).  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  Maryland v. Garrison, 480 U.S. at 84, 107.  Moreover, a particular warrant "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."  United States v. Chadwick, 433 U.S. 1, 9 (1977)(citations omitted).  See also Illinois v. Gates, 462 U.S. at 236 ("[P]ossession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct.").

<u>ANALYSIS</u>

Swabbing Sedillo and Sabaquie for DNA was reasonable.[8]  Facts in the Search Warrant sufficiently connect both Defendants to the robberies and support a reasonable inference that the clothing will yield testable DNA.  Judge Yarbrough's probable-cause determination, therefore, was proper, and the Court denies the motion.

I.    **THE SEARCH WAS REASONABLE.**

The Fourth Amendment's touchstone is reasonableness.  The brief intrusions into the Defendants' cheeks to swab for DNA were reasonable under these circumstances.  First, the United States swabbed the Defendants pursuant to a warrant.[9]  The warrant alleges facts that support a nexus between the Defendants and several robberies executed by masked men.  Specifically, facts in the warrant tie: (i) the robbers' clothing with clothing that Sabaquie owned and Sedillo had in his bedroom; (ii) the robbers' getaway vehicle to Sedillo and Sabaquie; and (iii) the cellular telephones found in the getaway vehicle to Sedillo and Sabaquie.  The United States wishes to test the clothing tied to the robbers and to the defendants for DNA.  The Court concludes that, based on the facts alleged in the warrant, there is probable cause to swab the Defendants' cheeks for a DNA sample to compare with DNA collected from the clothing.

---

[8]The Court grants Sedillo's Motion to Join and considers both Defendants' arguments in this Memorandum Opinion and Order.

[9]The Court notes the United States could have obtained the Defendants' DNA via 34 U.S.C. § 40702(a)(1)(A), instead of a warrant.  <u>See</u> <u>also</u> Tr. at 42:21-22 ("We can go through statute[,] by the statute we can file a motion with the Court.")(Torrez).  Rather than seeking DNA via warrant and an ex parte proceeding before a Magistrate Judge, the Court would prefer the United States to file motions, such as this one, with the Court first.  Requests for DNA are typically contested.  Because they are contested, the arguments will inevitably come to the District Judge.  It is preferable that, in the first instance, both parties are heard on the issue. Moreover, it is preferable for judicial economy that matters are heard and decided once, instead of twice -- once by the Magistrate Judge and once by the District Judge.

In so concluding that probable cause exists, the Court determines that the Fourth Amendment does not require the United States to confirm that the evidence collected -- in this case, the clothing -- will yield a viable DNA sample before swabbing the arrestees for DNA. Probable cause is not a granular inquiry. Instead, it requires the Court or a Magistrate Judge to evaluate the totality of a case's circumstances to determine whether a search for information is justified based on the available evidence. Certainly, there must be a connection between the item or location to be searched and the crime, but the United States need not establish to a certainty that there will be relevant evidence in the place they seek to search.

First, Sedillo's and Sabaquie's connection to the getaway vehicle, the clothing, and the recovered cellular telephones supports Judge Yarbrough's probable-cause determination. Probable cause requires a nexus between suspected criminal activity and the place or things to be searched. See United States v. Corral–Corral, 899 F.2d at 937 (10th Cir.1990). The Magistrate Judge's task in issuing a search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x. 815, 821 (10th Cir.2006)(unpublished)(quoting Illinois v. Gates, 462 U.S. at 238). In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"[A] general description of either the getaway car or the suspects is a sufficient basis for the existence of probable cause." United States v. Miller, 532 F.2d 1335, 1338 (10th Cir. 1976)(collecting cases). See Chambers v. Maroney, 399 U.S. 42, 46-47 (1970)(ruling that

probable cause existed to arrest a man in a blue station wagon wearing a green sweatshirt where eye witnesses identified robbers as driving a blue station wagon getaway vehicle and one of the robbers as wearing a green sweatshirt); United States v. Thompson, 425 F. App'x 695, 698 (10th Cir. 2011)(unpublished); United States v. Young, 1992 WL 401580, at *1 (10th Cir. December 21, 1992)(unpublished).  In United States v. Miller, the Tenth Circuit concluded that a search warrant's description of two robbers, indicating their approximate height, body type, and that one wore a black hat and that the other wore striped pants, in addition to a description of the gold and tan Cadillac getaway car, supported probable cause to search the car.  See United States v. Miller, 532 F.2d at 1338.  In contrast, in United States v. Soza, 686 F. App'x 564, 567-68 (10th Cir. April 21, 2017)(unpublished), the Tenth Circuit determined that a description of a Hispanic man, in his forties, wearing a grey shirt and a baseball cap was insufficient information for probable cause to arrest a man matching that general description near a break-in in Albuquerque, because it was likely that officers would "discover[] multiple Spanish or Latino males wearing grey shirts and baseball caps in a nearby area."  United States v. Soza, 686 F. App'x at 567.  See United States v. Miller, 532 F.2d at 1338 ("The Supreme Court has recognized that the standards applicable to the determination of probable cause in a search case are substantially similar to the standards which are applied to the arrest of the person.").

The Search Warrant satisfies the Tenth Circuit's standard from United States v. Miller, 532 F.2d at 1338, because the Search Warrant's facts sufficiently connect both Defendants to at least some of the robberies.  Turning to Sabaquie first, facts link him to the robbers' getaway vehicle.  For example, Garcia informed officers that, on the night of the Verizon robbery, she saw Sabaquie leave Sedillo's and Gallardo's apartment in a red Scion car.  See Findings of Fact ¶ 60, at 12; Complaint ¶ 15, at 6; Search Warrant ¶ 15, at 6.  Eye witnesses identified a red box-

style vehicle or a red Scion -- a box-style vehicle -- as the robbers' getaway vehicle for the 7-Eleven, Wienerschnitzel, and Verizon heists. See Findings of Fact ¶¶ 12, 18, 35, at 6-7, 9; Complaint ¶¶ 4-5, 8, at 2-3; Search Warrant ¶¶ 4-5, 8, at 2-3. After the Verizon robbery, officers discovered Sabaquie walking quickly away from the red Scion that the police pursued. See Findings of fact ¶ 42, at 10; Complaint ¶ 10, at 4; Search Warrant ¶ 10, at 4. Finally, after searching the red Scion, officers discovered a cellular telephone with Sabaquie's photographs on it. See Findings of Fact ¶ 49, at 11; Complaint ¶ 12, at 5; Search Warrant ¶ 12, at 5.

Facts also link Sabaquie to one of the robbers' description and clothing. Garcia identified a grey and black hooded sweatshirt as Sabaquie's, and one of the 7-Eleven robbers wore a grey and black hooded sweatshirt. See Findings of Fact ¶¶ 11, 58, at 6, 12; Complaint ¶¶ 4, 14, at 2, 5; Search Warrant ¶¶ 4, 14, at 2, 5. Sabaquie is Hispanic, and police officers described him as "short"; eye witnesses described the grey and black hooded sweatshirt robber as Hispanic and 5'6" or 5'7". See Findings of Fact ¶¶ 11, 43, at 6, 10; Complaint ¶¶ 4, 10, at 2, 4; Search Warrant ¶¶ 4, 10, at 2, 4.[10] A description of one of the Metro PCS robbers and a Verizon robber also bears some resemblance to Sabaquie, because eye witnesses described that robber as Hispanic and either 5'6" or short. See Findings of Fact ¶¶ 22, 34, at 7, 9; Complaint ¶¶ 6, 10, at 3-4; Search Warrant ¶¶ 6, 10, at 3-4. Although any one of those facts alone or even a couple of those facts together might be insufficient to create a nexus between the crimes and Sabaquie -- i.e. a Hispanic male owning a grey and black hooded sweatshirt in Albuquerque, see United

---

[10]Sabaquie argues that the Search Warrant contains an inconsistency, namely that, in one sentence, it ties the grey and black hooded sweatshirt to Cornwell, not Sabaquie. See Reply ¶ 4, at 3. It is true that the Search Warrant states once that "Subject 3," identified as Cornwell, wore the grey and black hooded sweatshirt during the 7-eleven robbery. Search Warrant ¶ 13, at 5. Nevertheless, the identifying features of that robber match Sabaquie. Moreover, other sections of the Search Warrant associate "Subject 4," identified as Sabaquie, with the 7-eleven robber who wore the grey and black hooded sweatshirt. Search Warrant ¶¶ 4, 10, at 2, 4.

<u>States v. Soza</u>, 686 F. App'x at 567 -- all of them combined rise to the level of probable cause, <u>see</u> <u>United States v. Miller</u>, 532 F.2d at 1338; <u>United States v. Thompson</u>, 425 F. App'x at 698.

The evidence connecting Sedillo to the robberies is not as robust, but still supports probable cause. First, a tipster told police that Sedillo was robbing cellular telephone stores and using a red box-style vehicle as a getaway car. <u>See</u> Findings of Fact ¶¶ 26-27, at 8; Complaint ¶ 7, at 3; Search Warrant ¶ 7, at 3; Sedillo Search Warrant ¶ 7, at 3; <u>United States v. Thompson</u>, 425 F. App'x at 698 (ruling that an anonymous tip identifying a robber and the getaway vehicle, among other facts, supported probable cause to search the man's car). Second, officers found Nike high-top shoes, a black bag, and green and yellow shoes in Sedillo's room; eye witnesses recounted that one robber at several of the heists wore or carried similar items. <u>See</u> Findings of Fact ¶¶ 14, 21, 36, 57, at 7, 9, 12; Complaint ¶¶ 3, 5-6, 13, at 1-3, 5; Search Warrant ¶¶ 3, 5-6, 13, at 1-3, 5; Sedillo Search Warrant ¶¶ 3, 5-6, 13, at 1-3, 5. Finally, the other active cellular telephone found in the red Scion yielded a photograph that matched a distinctive photograph on Sedillo's Facebook page. <u>See</u> Findings of Fact ¶ 50, at 11; Complaint ¶ 12, at 5; Search Warrant ¶ 12, at 5; Sedillo Search Warrant ¶ 12, at 5. These facts create a nexus between Sedillo and the robberies.[11]

Although there is a nexus between the robberies, the getaway vehicle, and the Defendants, the search here is not of a car, as in <u>United States v. Miller</u>, but of two individuals' cheeks for DNA. <u>See</u> <u>Maryland v. King</u>, 133 S. Ct. at 1968-69 ("[A] buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."). To be sure, the nexus must be connected to the place searched. <u>See</u> <u>United States v. Nolan</u>, 199 F.3d 1180, 1183 (10th

---

[11]There was, accordingly, probable cause for both Defendants' arrests. The Court notes that a grand jury also determined there was probable cause to support an indictment against both Defendants. <u>See</u> Superseding Indictment at 1-3, filed June 28, 2017 (Doc. 22).

Cir. 1999)("The test is whether the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched.").  "To establish the required nexus," however, "the affidavit supporting the search warrant need not contain direct evidence or personal knowledge that the items sought are located at the place to be searched."  United States v. Nolan, 199 F.3d at 1183.  "Rather, the issuing magistrate judge 'may draw reasonable inferences from the material provided in the warrant application.'"  United States v. Nolan, 199 F.3d at 1183 (quoting United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998)).

The Defendants argue that the buccal swab search is unreasonable, because the Search Warrant lacks facts to conclude that the clothing will yield relevant evidence in the form of testable DNA.  See Reply ¶¶ 5-7, at 4-5.[12]  From that premise, they contend that there is no nexus between relevant evidence -- viable DNA from the items -- and the search -- the buccal swab. See Reply ¶ 8, at 5.  The Court disagrees.

Although the Search Warrant lacks direct evidence that the United States will find testable DNA on the items, it contains circumstantial evidence to that effect.  For example, Sandoval notes that, "[b]ased on [her] expertise, there is a probability that DNA and fingerprints will be found on the items."  Search Warrant ¶ 16, at 6.  While the Defendants attack Sandoval's credentials and experience, see Reply ¶ 6, at 4, the Magistrate Judge is entitled to "draw reasonable inferences" from the warrant, United States v. Nolan, 199 F.3d at 1183.  One reasonable inference is that, even with only a year's experience, an FBI agent in Albuquerque's violent-crimes squad who "collect[s] evidence" has familiarity with items that will yield a viable

_____

[12]The Defendants argue that, on top of testing the clothing recovered, the United States will also test the cellular telephones for DNA.  See Reply ¶ 6, at 5.  The United States does not argue anywhere that it will test the cellular telephones for DNA; instead, it argues only that it will test "DNA evidence on the clothing."  Response at 5.

DNA sample.  Search Warrant ¶ 2, at 1.  Even if, however, Judge Yarbrough was required to discount the agent's statement, the warrant still supports a reasonable inference that testable DNA could be collected from the clothing.  Indeed, viable DNA samples are collected from clothing frequently enough that it was reasonable for Judge Yarbrough to conclude that a viable DNA sample would be collected from the clothing here.  See, e.g., United States v. Davis, 690 F.3d 226, 232 (4th Cir. 2012)(noting that a "DNA sample had been lifted from [the defendant's] clothing"); United States v. Quesada-Ramos, 429 F. App'x 909, 912 (11th Cir. 2011)("[A] fragment of DNA on a t-shirt found at the scene shared 20 characteristics with [the defendant's] DNA".); Wright v. City of Philadelphia, 229 F. Supp. 3d 322, 328 (E.D. Pa. 2017)(Pratter, J.)(observing that investigators recovered DNA from a "shirt, jeans, and shoes"); Gentry v. Sinclair, 576 F. Supp. 2d 1130, 1137 (W.D. Wash. 2008)(Lasnik, J.)(observing that a hair found on a seized t-shirt yielded a testable DNA sample); Villafane v. Artus, 2011 WL 6835029, at *21-22 (E.D.N.Y. Nov. 17, 2011)(Feuerstein, J.)(noting that FBI recovered viable DNA from a sweater and a glove).

In arguing that probable cause does not exist, the Defendants have drawn the Court's attention to several federal and state cases that have, purportedly, grappled with this issue and have concluded that a buccal swab was unreasonable.  See Addendum to Hearing Argument: Cases for Court's Consideration at 2, filed August 10, 2017 (Doc. 42)("Case Addendum"); Tr. at 62:8-17 (Fernandez); id. at 65:3-6 (Fernandez).  For example, the Defendants urge us to consider testimony and an oral ruling from a D.C. Superior Court hearing before the Honorable Judge A. Franklin Burgess, Associate Judge of the Superior Court of the District of Columbia, United States v. Ferrell, 2012 CF3 21877 (Feb. 1, 2013).  See Case Addendum at 5-73 (citing United States v. Ferrell, 2012 CF3 21887 (D.C. Sup. Ct. 2013), taken on February 1, 2013 ("Ferrell

Tr.")).  In <u>United States v. Ferrell</u>, the D.C. Superior Court considered whether the Fourth Amendment barred the United States from collecting a buccal swab from a defendant where the United States had swabbed a firearm from the crime scene for DNA, but had yet to determine whether the firearm had yielded a testable DNA sample.  <u>See</u> Case Addendum at 52-53; Ferrell Tr. at 48:7-49:8 (Ambrosino, Court).  At the D.C. hearing, a DNA technician testified that analyzing a firearm for DNA requires recovering some skin cells from the firearm.  <u>See</u> Case Addendum at 40-41; Ferrell Tr. at 36:24-37:2 (Zeffer).  After further colloquy concerning the statistics for testing firearms, the defendant established that the prosecution could develop a relevant DNA sample from a gun "29% of the time."  Case Addendum at 58; Ferrell Tr. at 54:16-17 (Knight).  Judge Burgess concluded that a twenty-nine percent chance of recovering relevant evidence did not amount to probable cause and denied the United States' request for a buccal swab.  <u>See</u> Case Addendum at 61, 64; Ferrell Tr. at 57:24 (Court); <u>id.</u> at 64:3-8 (Court).

Assuming that the Court can and should consider the evidence from the hearing,[13] the Court is unpersuaded that the DNA-from-gun yield rate applies with equal force to clothing. Clothing has more direct and constant contact with the human body than a gun does.  Moreover, gun handles are often slick metal unlike sweater fibers, which can catch hairs in addition to skin cells from all parts of the body.  The Court concludes, accordingly, that the DNA yield rate from clothing would likely be greater than twenty-nine percent.  Even if, however, the Court accepts twenty-nine percent as the same yield rate for clothing, it would still conclude that probable

_____

[13]The Court notes that a probable-cause determination is usually limited to the facts within the four corners of the search-warrant affidavit, but the Tenth Circuit has signaled that a Magistrate Judge can rely on information "included in [other] sworn documents" to make a probable-cause determination.  <u>Kaiser v. Lief</u>, 874 F.2d 732, 735 (10th Cir. 1989).  As with the sworn documents in <u>Kaiser v. Lief</u>, the sworn testimony from <u>United States v. Ferrell</u> is likely sufficiently reliable for the Court to draw upon it in its probable-cause analysis, but the Court does not need to decide this issue, because it concludes that probable cause exists notwithstanding the testimony from the <u>United States v. Ferrell</u> hearing.

cause exists to swab Sedillo and Sabaquie for DNA.  As the Tenth Circuit has explained, "[m]ore than percentages, precedent and common sense rules . . . ought to inform the probable cause analysis."  United States v. Ludwig, 641 F.3d 1243, 1252 (10th Cir. 2011).  There are dangers to reducing probable cause to a mathematical formula, because doing so would "ignore the fact that many factors relevant to a probable cause analysis . . . aren't subject to easy quantification."  United States v. Ludwig, 641 F.3d at 1251.  Probable cause does not require a preponderance of the evidence showing, see United States v. Ludwig, 641 F.3d at 1252, and twenty-nine percent comes close to a success rate of about a third.  If there is close to a one in three chance that the United States will uncover viable DNA on the clothing, there is probable cause that DNA will be found.  It is not just a hunch, speculation, or a fishing expedition. Rather, their request is grounded in a real probability.  On the facts of this case, there was probable cause to swab for DNA.[14]

The other cases the Defendants cite in the Case Addendum are similarly unpersuasive.  In United States v. Marshall, No. 11-0381, 2012 WL 2994020, at *2 (W.D.N.Y. July 20, 2012)(McCarthy, M.J.),  the Honorable Jeremiah J. McCarthy, United States Magistrate Judge of the United States District Court for the Western District of New York, determined that there was "reasonable suspicion to believe that [the defendants'] DNA w[ould] be located on" firearms recovered from a crime scene, but nevertheless barred a buccal DNA swab, because the United

---

[14]Sabaquie argues in his Reply: "[W]e do not know how long the alleged sweater had been out of Mr. Sabaquie's custody, under what circumstances and for how long someone other than Mr. Sabaquie was wearing the sweater, [or] whether the sweater had been laundered since it was allegedly in the custody of Mr. Sabaquie."  Reply ¶ 7, at 5.  Those questions are good ones, likely to be relevant at trial, but merely asking those questions at this stage do not undermine a probable-cause ruling.  On the other hand, if, for example, Sabaquie had demonstrated that the sweater had been laundered or heavily used by someone else between the robberies and the police's recovery of the sweater, Sabaquie might be more successful in raising doubt as to whether probable cause exists.

States had represented that the DNA profile recovered from the firearm was "not suitable" for entry in the FBI's combined DNA index system used to compare DNA samples on a national basis.  United States v. Marshall, 2012 WL 2994020, at *2.  See Combined DNA Index System (CODIS), available at https://www.fbi.gov/services/laboratory/biometric-analysis/codis. Magistrate Judge McCarthy concluded, accordingly, that, if the DNA was not suitable for the FBI's DNA index system, there is "nothing to suggest that compelling defendants' DNA will lead to probative evidence in this case."  United States v. Marshall, 2012 WL 2994020, at *3.  In contrast, here, the United States has not represented that any DNA it has collected is unsuitable or defective.  The Defendants also direct the Court to United States v. Lassiter, 607 F. Supp. 2d 162 (D.D.C. 2009)(Friedman, J.), but that case does not support their position, because there the Honorable Judge Friedman, United States District Judge for the District of the District of Columbia, determined that probable cause existed to swab for DNA.  See United States v. Lassiter, 607 F. Supp. at 167-68 ("[I]t is reasonable under the Fourth Amendment to compel Mr. Hebron to submit to a buccal cell swab for the purposes of conducting DNA analysis.").

The two remaining cases from the Case Addendum are state cases that do not persuade the Court.  In Matter of Lavigne, 418 Mass. 831 (1994), the Supreme Judicial Court of Massachusetts considered whether a blood extraction violated the Fourth Amendment and the Constitution of the State of Massachusetts.  See Matter of Lavigne, 418 Mass. at 833.  Regarding the Fourth Amendment, the Supreme Judicial Court of Massachusetts' ruling was only that the "Commonwealth is required to demonstrate a sufficient nexus between the evidence sought and [the victim's] murder," and it remanded the case for a determination consistent with its opinion. Matter of Lavigne, 418 Mass. at 835-36.  The Court agrees with the Supreme Judicial Court of Massachusetts' determination that probable cause requires a nexus between the evidence sought

and the crime, but otherwise concludes that Matter of Lavigne offers little meaningful guidance. The final case, see Matter of Valdes v. Rosa, 814 N.Y.S. 2d 234 (App. Div. 2006), turns on state-law grounds, so the Court concludes it is inapposite.[15]

With probable cause established for the warrant, the Court's inquiry is not concluded. A search which involves a bodily intrusion requires more than just probable cause to be reasonable under the Fourth Amendment, but also requires balancing the following three factors from Winston v. Lee, 470 U.S. 753, 761-62 (1985): (1) "the extent to which the [intrusion] may threaten the safety or health of the individual"; and (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity"; balanced against (3) "the community's interest in fairly and accurately determining guilt or innocence." Winston v. Lee, 470 U.S. at 761-62. See id. at 759 ("A compelled surgical intrusion into an individual's body for evidence, however, . . . may be 'unreasonable' even if likely to produce evidence of a crime."); Whren v. United States, 517 U.S. 806, 818 (1996)(noting that, even with probable cause, a balancing analysis was necessary for a "physical penetration of the body"); United States v. Lassiter, 607 F. Supp. 2d at 165 (noting that, "as the Supreme Court stated in *Schmerber,* in addition to the existence of probable cause under the Fourth Amendment, the procedures employed in taking blood must be reasonable"); Bill v. Brewer, 799 F.3d 1295, 1302 (9th Cir. 2015)(conducting a Winston v. Lee analysis for a DNA swab after determining that a warrant was valid). See also United States v. King, 222 F.3d 1280 (10th Cir. 2000)(conducting a

---

[15]At the Hearing, the Defendants cited several more D.C. Superior Court cases to support their position. See Tr. at 62:8-18 (Fernandez)(citing 2015 CF2 1446, 2014 CF1 016923, 2013 CF2 19712, 2013 CF1 3470, 2013 CF 31473, 2012 CF3 21887). The Court was unable to locate those cases when it searched Westlaw, LexisNexis, or the D.C. Superior Court's website. The Court doubts that these state cases will persuade the Court to change its position, but it will consider them if the Defendants provide them to the Court.

Winston v. Lee balancing test inquiry where police had an arrest warrant for a man, but, instead of seizing him immediately at the threshold of his home, officers tackled him into his kitchen).

After balancing the factors from Winston v. Lee, the Court concludes that the buccal swabs were reasonable. As the Supreme Court recognized in Maryland v. King, a buccal swab "involves but a light touch on the inside of the cheek," and "it 'involves virtually no risk, trauma, or pain.'" Maryland v. King, 133 S. Ct. at 1969 (citing Schmerber v. California, 384 U.S. at 771)). The first factor, thus, whether the intrusion threatens the individual's safety or health, weighs toward reasonableness. The second factor, the extent that the intrusion has upon the individual's dignitary interests in personal privacy and bodily integrity, similarly counsels towards reasonableness. While a buccal swab is an intrusion, "a swab of this nature does not increase the indignity already attendant to normal incidents of arrest." Maryland v. King, 133 S. Ct. at 1969. The final factor, the public's interest in a fair and accurate determination of guilt or innocence, is ambivalent. On the one hand, the United States has represented that it needs the DNA swab to aid it in determining the masked robber's identities -- the DNA evidence could be important in determining who might be guilty or who might be innocent. On the other hand, the Defendants contend that a DNA swab at this juncture jeopardizes the DNA test's accuracy. See Reply ¶¶ 1-7, at 8-11. The Court has no reason to doubt the Defendant's social science articles arguing that a cognitive bias or DNA contamination risk exists, but the Court is unpersuaded that the risk is so great in this case that it counsels toward overriding -- on Fourth Amendment grounds -- the United States' interest in the swab. If anything, the articles do not counsel against the swab itself, but instead counsel against carelessly testing DNA. Moreover, the Court has already afforded the Defendants some relief in accord with the counsel to carefully test the DNA by ordering the United States to separate the swab samples from the sweater samples, and to not

test the DNA swabs until the Court issues an opinion. <u>See</u> Tr. at 72:16-74:10 (Court, Fernandez, Torrez). With the first two factors indicating a minimal intrusion coupled with the third factor that counsels neither way, the buccal swabs were reasonable under <u>Winston v. Lee</u>, 470 U.S. at 761-62.[16]

---

[16]Absent probable cause, however, the Court would conclude that the buccal-swab searches were unreasonable and therefore unconstitutional. In both <u>Winston v. Lee</u> and <u>Schmerber v. California</u>, the Supreme Court indicated that a warrantless search of a person's body requires probable cause. <u>See</u> <u>Schmerber v. California</u>, 384 U.S. at 770 ("[T]he facts . . . established probable cause to arrest."); <u>Winston v. Lee</u>, 470 U.S. at 761, 763 ("*Schmerber* recognized that the ordinary requirements of the Fourth Amendment would be threshold requirements for conducting this kind of surgical search and seizure. We noted the importance of probable cause. . . . The Commonwealth plainly had probable cause to conduct the search."). In <u>Schmerber v. California</u>, the Supreme Court concluded that a warrantless blood test of a suspected drunk driver was reasonable given sufficient facts to establish probable cause, and given that the relevant evidence, the suspect's blood-alcohol level, would have been destroyed if the officer had sought out a magistrate judge to secure a warrant. <u>See</u> <u>Schmerber v. California</u>, 384 U.S. at 770-71. <u>See also</u> <u>Winston v. Lee</u>, 470 U.S. at 759 ("The authorities in *Schmerber* clearly had probable cause to believe he had been driving while intoxicated and to believe that a blood test would provide evidence that was exceptionally probative. . . . Because the case fell within the exigent-circumstances exception to the warrant requirement, no warrant was necessary."). In <u>Winston v. Lee</u>, the Supreme Court concluded that an exigent circumstance was not required to conduct a warrantless body search, but, nevertheless, concluded that the government must have probable cause to search the suspect's body before balancing the government's interest in a fair and accurate trial against the individual's privacy and health interests. <u>See</u> 470 U.S. at 760-63.

In <u>Marshall v. Columbia Lea Regional Hosp.</u> ("<u>Marshall</u>"), the Tenth Circuit concluded that probable cause is still a threshold requirement for bodily searches. <u>See</u> <u>Marshall</u>, 345 F.3d at 1172. "It follows that a warrantless blood test, performed without consent, is presumptively unreasonable unless the state actors involved had probable cause and exigent circumstances sufficient to justify it." <u>Marshall</u>, 345 F.3d at 1172. In so concluding, the <u>Marshall</u> court determined that there was not probable cause and that

> [i]t would be strange to hold that a police officer may obtain a blood sample on the basis of exigent circumstances *without* a warrant, when he could not have lawfully conducted the same search *with* a warrant. The rationale for the exigent circumstances doctrine is to avoid the loss of evidence due to the time required for obtaining a warrant -- not to enable police to obtain evidence in cases of alleged violations too trivial to support a warrant.

<u>Marshall</u>, 345 F.3d at 1174 (emphasis in original).

That is not to say that the exigent circumstances exception always requires probable cause.  See United States v. Najar, No. 03-0735, 2004 WL 3426123, at *4-5, 8 (D.N.M. Sept. 3, 2004)(Browning, J.) aff'd 451 F.3d 710, 712 (10th Cir. 2006) cert. denied 549 U.S. 1013 (2006).  Probable cause is not required when "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." United States v. Najar, 451 F.3d at 718.  See McInerney v. King, 791 F.3d 1224, 1231 (10th Cir. 2015).  Some examples of exigent circumstances justifying a probable cause-less search and/or entry include: suspects firing or brandishing weapons at police officers, see United States v. Najar, 451 F.3d at 717-18 (collecting cases); and officers entering a burning building, see Michigan v. Tyler, 436 U.S. 499, 509 (1978).  The Court concludes, however, that the narrow circumstances required for such searches are not present here.  There is no evidence of an immediate threat to officers or to public safety -- or some other emergency -- triggering the buccal-swab search.  The Court, in fact, is hard pressed to conceive of a circumstance where an immediate need to protect the lives or safety of others would reasonably prompt an officer to swab someone for DNA.  That does not mean, however, that such a case could not occur.

The suspicionless but still reasonable buccal swab search in Maryland v. King does not apply here.  There, the Supreme Court concluded that a buccal swab, collected pursuant to the Maryland DNA Collection Act, Md. Code Ann. § 2-504, was reasonable, because the search involved no discretion on part of law enforcement officers -- the Maryland DNA Collection Act required officers to swab all arrestees charged with serious crimes (as long as the arrest was supported by probable cause) -- and because the government's interest in identifying arrestees outweighed the minimal privacy interests implicated by a buccal swab.  See Maryland v. King, 133 S. Ct. at 1970-74, 1977-79.  While probable cause was needed to support the arrest, the Supreme Court concluded that the Fourth Amendment does not require, in that context, probable cause, or "individualized suspicion," to connect the buccal-swab search with a crime to justify the search.  Maryland v. King, 133 S. Ct. at 1969-70.  The Supreme Court reasoned that the Fourth Amendment allows a search absent the usual nexus between the place or person to be searched and a crime, because the Maryland DNA Collection Act was non-discretionary; officers did not choose when to swab for DNA, they did it for every arrestee charged with a serious offense.  See 133 S. Ct. 1970.  The Court alluded to a second reason that informed its analysis, namely, that the long history of the "Fourth Amendment allows police to take certain routine 'administrative steps incident to arrest,'" 133 S. Ct. at 1977 (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 58 (1991)), but it did not rest its holding on that reason for concluding individualized suspicion is not required, see 133 S. Ct. 1970.  See also id. at 1982 (Scalia, J. dissenting).

In so ruling, the Supreme Court went to great lengths to narrow its holding to situations where a buccal-swab search is non-discretionary or, potentially, an administrative booking search.  See 133 S. Ct. at 1969 ("The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.")(brackets in original)(quoting Treasury Emps. v. Von Raab, 489 U.S. 656, 667 (1989)); Maryland v. King, 133 S. Ct. at 1970 ("The DNA collection is not subject to the judgment of officers."); id. at 1980 ("[T]he Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure."); id. ("When officers make an arrest supported by probable

cause . . . analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment."). See also id. at 1970 ("It is beyond dispute that 'probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest.'")(quoting Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975)). The Supreme Court noted that there are two other circumstances "in which the Court has held that particularized suspicion is not categorically required: 'diminished expectations of privacy [and] minimal intrusions.'" 133 S. Ct. at 1979 (quoting Illinois v. McArthur, 531 U.S. at 330). After noting those circumstances however, the Supreme Court did not rule that a buccal swab is always so minimal an intrusion and that an arrestee's expectations of privacy are always so diminished that particularized suspicion is unnecessary for a buccal swab. See 133 S. Ct. at 1979 ("This is not to suggest that any search is acceptable solely because a person is in custody."). Rather, it again emphasized the non-discretionary nature of the swab and weighed the privacy interests under the balancing test already articulated: "[B]y contrast to the approved standard procedures incident to any arrest detailed above, a buccal swab involves an even more brief and still minimal intrusion." 133 S. Ct. at 1979.

Here, the buccal-swab searches of Sabaquie and Sedillo were not non-discretionary searches, nor were they administrative steps or booking procedures associated with an arrest. In both instances, the United States targeted the Defendants by seeking a buccal swab via a warrant -- a discretionary procedure. See Motion ¶ 2, at 2; Motion to Join ¶ 16, at 4. It did not invoke a statute applicable to all arrestees or some other procedure associated with every arrest. The United States wanted and requested Sabaquie and Sedillo's DNA, because they thought it might help them solve a crime. That kind of search is precisely when Fourth Amendment protections are at their zenith. See City of Indianapolis v. Edmond, 531 U.S. 32, 38 (2000)("In none of these cases, however, did we indicate approval of a [suspicionless search] whose primary purpose was to detect evidence of ordinary criminal wrongdoing."); United States v. Marshall, 986 F.2d 1171, 1175 (8th Cir. 1993)("The requirement of standardized procedures serves to remove the inference that the police have used the inventory searches as 'a purposeful and general means of discovering evidence of crime.'")(quoting Colorado v. Bertine, 479 U.S. 367, 377 (1987)(Blackmun, J. concurring)); United States v. Bowhay, 992 F.2d 229, 231 (9th Cir. 1993)("[A]n inventory search is invalid if it was a pretext for an investigative search."). See also Maryland v. King, 133 S. Ct. at 1980 (Scalia, J. dissenting)("Whenever this Court has allowed a suspicionless search, it has insisted upon a justifying motive apart from the investigation of crime."). But cf. United States v. Sanchez-Pena, 336 F.3d 431, 437 (5th Cir. 2003)("An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.").

It is possible, however, that a buccal-swab search could be reasonable under the search-incident-to-arrest exception to the warrant requirement. See Maryland v. King, 133 S. Ct. at 1982 (Scalia, J. dissenting)(suggesting that that a valid swab search would occur if the swab was to gather "evidence relevant to the crime of arrest"); Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016). See also Arizona v. Gant, 556 U.S. 332, 343 (2009)("[W]e conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'")(quoting Thornton v. United States, 541 U.S. 615, 632 (2004)(Scalia, J. concurring)). That exception diverges from the administrative or booking search exception, because it justifies

a targeted search for relevant evidence. In <u>Birchfield v. North Dakota</u>, for example, the Supreme Court upheld a warrantless bodily-search breath test, incident to a drunk-driving arrest, but ruled unconstitutional a bodily-search blood test, taken subject to a drunk driving arrest. <u>See</u> <u>Birchfield v. North Dakota</u>, 136 S. Ct. at 2185.

The parties have not briefed this specific issue, and the Court perceives distinctions between <u>Birchfield v. North Dakota</u> and this case: (i) the swab searches here are separated temporally from the arrest; (ii) the evidence sought is not likely to be destroyed between the time of arrest and the time it takes to procure a warrant; and (iii) the Supreme Court approved warrantless searches in <u>Birchfield v. North Dakota</u>, but not necessarily searches absent a nexus between the search and the crime of arrest. <u>See</u> <u>Birchfield v. North Dakota</u>, 136 S. Ct. at 2170-72. There is no question that a blood or breath test would yield relevant evidence to a drunk-driving arrest, but, here, Sabaquie and Sedillo challenge the nexus between their purported crime and the search.

The Court concludes that the search-incident-to-arrest exception is inapplicable here. The two searches are too temporally separated from the arrest to constitute a search incident to arrest. Sedillo was arrested on May 9, 2017, <u>see</u> Arrest Warrant at 1, filed May 11, 2017 (Doc. 11), but he was not swabbed until sometime in late June or early July, <u>see</u> Motion to Join ¶¶ 9, 16, at 3-4. Sabaquie was arrested on May 15, 2017, <u>see</u> Arrest Warrant at 1, filed May 22, 2017 (Doc. 14), but he was also not swabbed until sometime in July, <u>see</u> Reply ¶ 1, at 1. As the Tenth Circuit has recognized, "the proper analysis" for the temporal aspect of a search incident to arrest "is not a minute-by-minute comparison of the 'time of arrest' with the 'time of search,' but rather, '[t]he relevant distinction turns . . . upon whether the arrest and search are so separated in time or by intervening events that the latter cannot fairly be said to have been incident to the former.'" <u>United States v. Rollins</u>, 190 F. App'x 739, 744 (10th Cir. 2006)(unpublished)(quoting <u>United States v. Abdul-Saboor</u>, 85 F.3d 664, 668 (D.C. Cir. 1996)). <u>See</u> <u>United States v. Sanchez</u>, 555 F.3d 910, 920 (10th Cir. 2009)(holding that a search must be "substantially contemporaneous with the arrest"); <u>United States v. Lugo</u>, 170 F.3d 996, 1003 (10th Cir. 1999). The Tenth Circuit has cautioned that the temporal analysis is more than just a "time of arrest" versus "time of search" test -- a court must "examin[e] . . . the entire interaction to determine whether search was actually incident to arrest." <u>United States v. Rollins</u>, 190 F. App'x at 745. Typically, however, a search incident to arrest is measured in minutes, not months. <u>See</u> <u>United States v. Rollins</u>, 190 F. App'x. at 745 (search justifiable thirty-five minutes after arrest); <u>United States v. Fisher</u>, 50 F. App'x 947, 949 (10th Cir. 2002)(unpublished)(search justifiable five minutes after arrest); <u>United States v. Torres-Castro</u>, 470 F.3d 992, 998 (10th Cir. 2006)("We note that courts have found that a search may be incident to an arrest in cases where the search and arrest were separated by times ranging from five to sixty minutes."). The month between the swab searches and the arrests coupled with various intervening actions before the swabs -- e.g., counsel had been assigned, a discovery order had been entered, arraignments had either occurred or had been set-- indicate that the search-incident-to-arrest period had ended.

The Court notes that, in the distinct, but similar, traffic-stop context, officers may constitutionally extend a traffic-stop seizure for various reasons not linked to the stop's initial purpose. The Court has criticized the jurisprudence allowing officers to extend such traffic stops. <u>See</u> <u>United States v. Torres</u>, No. 16-4138, 2017 WL 3149395, at *24 n.10 (D.N.M. June 9, 2017)(Browning, J.). For example, when an officer pulls a motorist over for speeding, why may the officer inspect the car's VIN number without independent reasonable suspicion or

While the Court shares the Defendants' concerns about accuracy, ultimately, the risk of inaccuracy does not reach constitutional dimensions. The Constitution cannot prevent all risks or dangers; here, if the tests <u>are</u> done with care, they should produce reliable evidence -- either exculpating or inculpating the Defendants. The Constitution does not require judge-made prophylactic measures to heighten the test's trustworthiness.

**IT IS ORDERED** that: (i) the Defendants' Motion to Void Search Warrant For DNA Sample or For Return of DNA Sample Pursuant to F.R.C.P. 41(g), filed July 6, 2017 (Doc. 29) is denied; and (ii) Defendant Sedillo's Opposed Motion to Join in Defendant Sabaquie's Motion to Void Search Warrant for DNA Sample or For Return of DNA Sample Pursuant to F.R.C.P. 41(g), filed July 31, 2017 (Doc. 35) is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James D. Tierney
   Acting United States Attorney
Presiliano Torrez
Howard R. Thomas
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

---

consent to do so? The VIN number provides no information related to the vehicle's speed. Once again, however, those extensions of time usually amount to minutes, not months. The Court concludes, accordingly, that the swab searches of Sabaquie and Sedillo cannot fall under the search-incident-to-arrest exception.

Daniel J Tallon
Daniel J. Tallon, Attorney at Law
Placitas, New Mexico

> *Attorney for the Defendant Bruce Sedillo*

Alejandro Benito Fernandez
   Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

> *Attorney for the Defendant Loren Sabaquie*