# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

                                       No. CR 17-1371 JB

BRUCE SEDILLO; LOREN SABAQUIE;
and ROBERT GALLARDO,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Memorandum Opinion and Order, filed December 19, 2018 (Doc. 162)("MOO"), in which the Court granted the Plaintiff United States of America's request for restitution for the victim, M.D., a Verizon Wireless employee, related to the Defendants Bruce Sedillo, Loren Sabaquie, and Robert Gallardo's robbery of Verizon Wireless. See Memorandum Opinion and Order at 1. The Court held an evidentiary hearing on March 21, 2019. See Clerk's Minutes at 1, filed March 21, 2019 (Doc. 189). The primary issue is the amount of restitution that the Defendants must pay to M.D. The Court grants restitution for $20,501.96.

## FINDINGS OF FACT

1.      On January 16, 2017, Gallardo and Sedillo entered a Metro PCS store with a "chrome pistol with an extended magazine" and stole "iphones, Sound Bands,[1] SD cards[2] and

---

[1]The Court assumes that "Sound Bands" refers to a type of headphone. Sabaquie PSR ¶ 10, at 5; Gallardo PSR ¶ 11, at 5; Sedillo PSR ¶ 11, at 5 (quotation identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR). See Gadget Review, http://www.gadgetreview.com/sound-band-headphones (last visited Dec. 17, 2018).

[2]An SD card, or secure digital card, "is a non-volatile memory card," an electronic device used for storing and retrieving digital data without powering off the device. Secure Digital,

an unknown amount of cash."  Sabaquie PSR ¶ 10, at 5; Gallardo PSR ¶ 11, at 5; Sedillo PSR ¶ 11,

at 5 (quotations identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR).

2.       On January 21, 2017, Sedillo and Sabaquie took "cigarettes, beer, and an unknown

amount of cash" from a 7-Eleven and "fled in a Scion[3] style 'box car.'"  Sabaquie PSR ¶12, at 5;

Gallardo PSR ¶ 13, at 5; Sedillo PSR ¶ 13, at 5 (quotations identical in the Sabaquie PSR, the

Gallardo PSR, and the Sedillo PSR).

3.       On January 25, 2017, Sedillo, with two men not indicted as co-Defendants, robbed

a Wienerschnitzel and fled in a "red box style vehicle."  Sabaquie PSR ¶ 13, at 5; Gallardo PSR

¶ 14, at 5; Sedillo PSR ¶ 14, at 5 (quotation identical in the Sabaquie PSR, the Gallardo PSR, and

the Sedillo PSR).

4.       On January 26, 2017, Sedillo, Sabaquie, Gallardo, and a fourth, unidentified man,

robbed the same Metro PCS store previously robbed on January 16, 2017.  See Sabaquie PSR ¶ 14,

at 5-6; Gallardo PSR ¶ 15, at 5-6; Sedillo PSR ¶ 15, at 5-6.

5.       On February 2, 2017, while detectives were conducting surveillance at a Verizon

Wireless store, Sedillo, Sabaquie, Gallardo, and a fourth, unindicted man, entered the store with

two handguns.  See Sabaquie PSR ¶ 16, at 6; Gallardo PSR ¶ 17, at 6; Sedillo PSR ¶ 17, at 6.

---

Wikipedia, https://en.wikipedia.org/wiki/Secure_Digital (last visited Dec. 17, 2018). See Non-Volatile, Wikipedia, https://en.wikipedia.org/wiki/Non-volatile_memory (last visited Dec. 17, 2018); Flash Memory, Wikipedia, https://en.wikipedia.org/wiki/Flash_memory (last visited Dec. 17, 2018).  SD cards meet standards developed by the SD Association.  See Secure Digital, supra; SD Association, Wikipedia, https://en.wikipedia.org/wiki/SD_Association (last visited Dec. 17, 2018).

[3]Scion was a former car brand that Toyota Motors owned.  See Scion (automobile), Wikipedia, https://en.wikipedia.org/wiki/Scion_(automobile) (last visited September 4, 2020). Toyota began manufacturing the cars in 2003.  See Scion (automobile), supra.

6.      The two men armed with handguns "demanded cash and cellphones, demanding that the employees lay down on their faces.  One of the males put a handgun to one of the employees head and forced him to the back area of the store and had him open the safe."  Sabaquie PSR ¶ 19, at 7; Gallardo PSR ¶ 20, at 7; Sedillo PSR ¶ 20, at 7 (quotation identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR).

7.      Sedillo, Sabaquie, and Gallardo left the store with $5,260 in cash, and "smart phones and tablets."  Sabaquie PSR ¶ 19, at 7; Gallardo PSR ¶ 20, at 7; Sedillo PSR ¶ 20, at 7 (quotations identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR).

8.       Sedillo, Sabaquie, and Gallardo's vehicle fled the Albuquerque Police Department officers ("APD officers") at "a high rate of speed," and turned into a neighborhood.  Sabaquie PSR ¶ 16, at 6; Gallardo PSR ¶ 17, at 6; Sedillo PSR ¶ 17, at 6 (quotation identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR).

9.       When the APD officers located the vehicle, a "red Scion XB," the APD officers uncovered "an open bag full of box Verizon cellphones, shoes, and other clothing items associated with the robbery."  Sabaquie PSR ¶¶ 16-17, at 6; Gallardo PSR ¶¶ 17-18, at 6; Sedillo PSR ¶¶ 17-18, at 6 (quotations identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR).

10.     The APD officers located Sabaquie and Gallardo in the area.  See Sabaquie PSR ¶¶ 17-18, at 6-7; Gallardo PSR ¶¶ 18-19, at 6-7; Sedillo PSR ¶¶ 18-19, at 6-7.

11.     Since the Verizon Wireless robbery, M.D., an employee in the Verizon Wireless store at the time of the robbery, has ceased work at Verizon Wireless, and struggles to enter the community, crowded areas, or Verizon stores.  See Second Addendum to the Presentence Report as to Robert Gallardo at 1, filed September 18, 2018 (Doc. 119); Second Addendum to the Presentence Report as to Bruce Sedillo at 1, filed September 18, 2018 (Doc. 120); Second

Addendum to the Presentence Report as to Loren Sabaquie at 1, filed September 18, 2018 (Doc. 121)(collectively, "Second Addendum").

12.    Before the Verizon Wireless robbery, M.D. had worked forty-hour weeks and earned twenty-eight dollars per hour.  See Second Addendum at 1.

13.    Immediately after the robbery, Verizon Wireless supported M.D., but Verizon Wireless has stopped such payments until M.D. provides further information from his psychiatrist; M.D. is seeking to recover his lost wages.  See Second Addendum at 1.

14.    M.D.'s psychiatrist at the University of New Mexico Hospital ("UNMH"), Dr. Mario Cruz, has diagnosed M.D. with post-traumatic stress disorder ("PTSD"), and M.D. started medication in July, 2018, after three months of therapy.  See Second Addendum at 1.

15.    Dr. Cruz has M.D. restricting his work, but M.D. believes that his position at Verizon Wireless will be secure.  See Second Addendum at 1.

16.    M.D., however, "is now behind on paying his child support and has been receiving food stamps."  Second Addendum at 1.

17.    M.D. and his girlfriend must live on one salary, and M.D. is unsure if he will receive bills from UNMH.  See Second Addendum at 1.

18.    Verizon Wireless paid M.D. sixty percent of his normal salary for March 26, 2018, through July 14, 2018.  See Second Addendum at 1.

19.    The amount Verizon Wireless paid M.D. for that time period is $8,002.56.  See Second Addendum at 1.

20.    From July 14, 2018, to November 1, 2018, Verizon Wireless considered M.D. to be on an unpaid leave of absence.  See March 21 Tr. at 17:15-19 (Fernandez).

21.     In 2017, M.D. earned $59,579.36 in Medicare wages and tips.  See Street Expert Report at 10, filed September 4, 2020 (Doc. 201).

22.     In 2018, M.D. earned $36,886.30 in Medicare wages and tips.  See Street Expert Report at 10.

23.      M.D. received a miscellaneous pay increase of $4,136.96 in 2018. See March 21 Tr. at 10:16-21 (Street).  See March 21 Tr. at 10:16-21 (Street).

24.     As of July 14, 2018, M.D. earned $6,489.09 in short-term disability pay for 2018. See Street Expert Report at 12.

## PROCEDURAL BACKGROUND

A federal Grand Jury returned a five-count indictment.  See Superseding Indictment, filed June 28, 2017 (Doc. 22).  In Count 1, the Grand Jury indicts Sedillo and Gallardo for unlawfully obstructing, delaying, and affecting commerce, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2, by taking, through threats with a firearm, cash from Metro PCS employees.  See Superseding Indictment at 1.  In Count 2, the Grand Jury indicts Sedillo and Sabaquie for violating the same United States Code provisions by similarly taking, through threats with a firearm, cash from the 7-Eleven.  See Superseding Indictment at 1-2.  In Count 3, the Grand Jury indicts Sedillo for engaging in the same conduct and violating the same United States Code provisions at a Weinerschnitzel fast-food restaurant.  See Superseding Indictment at 2.  Count 4 and Count 5 state charges against Sedillo, Sabaquie, and Gallardo for the same conduct and in violation of the same United States Code provisions at, respectively, a Metro PCS and a Verizon Wireless store.  See Superseding Indictment at 2-3.  Sedillo, Sabaquie, and Gallardo each pled guilty to Count 5, which contained the charges for the Verizon Wireless robbery.  See Sabaquie PSR ¶ 2, at 4; Gallardo PSR ¶ 2, at 4; Sedillo PSR ¶ 2, at 4.  The Sedillo PSR, the Sabaquie PSR, and the Gallardo PSR

indicated that the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"),

applies to Sedillo's, Sabaquie's, and Gallardo's crime and that, although the United States

Probation Office ("USPO") sent "victim packets" to the Verizon Wireless, the USPO has not

received information from any victim.  Sabaquie PSR ¶ 26, at 8; Gallardo PSR ¶ 27, at 8; Sedillo

PSR ¶ 27, at 8 (quotation identical in the Sabaquie PSR, the Gallardo PSR, and the Sedillo PSR).

1.      **The PSRs.**

In July, 2018, the USPO filed Presentence Investigation Reports for Sedillo, Gallardo, and

Sabaquie.  See Presentence Investigation Report at 1, filed July 10, 2018 (Doc. 95)("Sedillo PSR");

Presentence Investigation Report at 1, filed July 23, 2018 (Doc. 96)("Gallardo PSR"); Presentence

Investigation Report at 1, filed July 27, 2018 (Doc. 98).  The PSRs note that the MMRA applies

to the offense.  See Sedillo PSR ¶ 26, at 8; Gallardo PSR ¶ 26, at 8; Sabaquie PSR ¶ 25; at 8.  In

the PSRs, the USPO further stated that, although restitution under 18 U.S.C. § 3663A is applicable,

the victims had not requested restitution at the time of the PSRs' writing.  See Sedillo PSR ¶ 89,

at 18; Gallardo PSR ¶ 90, at 19; Sabaquie PSR ¶ 94, at 21.  The PSRs also stated that "[r]estitution

shall be ordered" pursuant to U.S.S.G. § 5E1.1.  See Sedillo PSR ¶ 90, at 18; Gallardo PSR ¶ 91,

at 19; Sabaquie PSR ¶ 95, at 21.

2.      **The Second Addenda.**

On September 19, 2018, the USPO filed identical Second Addenda to the Presentence

Reports for Gallardo, Sedillo, and Sabaquie.  See Second Addendum, filed September 19, 2019

(Doc. 119); Second Addendum, filed September 19, 2018 (Doc. 120); Second Addendum, filed

September 19, 2018 (Doc. 121)(collectively "Second Addendum").  In the Second Addendum, the

USPO explains that it "received a phone call and interviewed the victim, M.D.," who described

his hardships since the Verizon Wireless robbery.  See Second Addendum at 1.  The USPO filed

a Second Addendum to the Presentence Report on September 18, 2018 (Doc. 120)("Sedillo Second Addendum").  In the Second Addendum, the USPO describes its interview with the victim, M.D. See Second Addendum at 1.  The USPO explains that M.D. stopped working at the Verizon Wireless store after the incident, and now he struggles to go into public.  See Second Addendum at 1.  Further, the USPO recounts, M.D. "cannot walk into any Verizon store, and cannot go into crowded areas."  Sedillo Second Addendum at 1.  The USPO relays that, at the time of the incident, M.D. worked at Verizon Wireless for forty hours a week, and Verizon Wireless compensated him at a rate of $28.00 per hour.  See Second Addendum at 1.  According to the USPO, after the robbery, from March, 2018 to June, 2018, Verizon paid M.D. sixty percent of his salary.  See Second Addendum at 1.  The USPO states that M.D.'s doctor diagnosed him with post-traumatic stress disorder in March, 2018, provided him with therapy, prescribed him medications in lieu of therapy in July, 2018, and stated that M.D. was on "work restriction" until January, 2019.  See Second Addendum at 1.  The USPO notes, however, that Verizon stopped paying M.D. any of his salary in June, 2018, citing insufficient documentation from M.D.'s psychiatrist.  See Second Addendum at 1.  Since Verizon Wireless stopped paying M.D., M.D. has been receiving food stamps and has been behind on his child support payments.  See Second Addendum at 1.  He has not yet received any bills from the UNMH for psychiatric treatment and is not sure whether he will eventually receive treatment bills.  See Second Addendum at 1.  The USPO states that M.D. has not provided it with documentation recording his lost wages and that M.D. "may come to the sentencing hearing but will not address the Court."  Second Addendum at 1.  The USPO assures the Court that, if it receives further information from M.D. or other victims, it will update the Court.  See Second Addendum at 1.

3.      **The Third Addendum.**

The USPO filed a Third Addendum to the Presentence Report for Robert Gallardo on February 4, 2019 (Doc. 169)("Third Addendum").[4]  The Third Addendum provides information about restitution.  It notes that, after the December 19, 2018, hearing, the USPO, the United States, and M.D. met, and M.D. provided medical documents and one June, 2018, earning statement.  The USPO explained to M.D. that the Court needs additional documentation, particularly with regards to lost wages, to determine restitution.  See Third Addendum at 1.  USPO and M.D. scheduled another meeting where M.D. was to provide the requested documents, but M.D. did not attend the meeting and did not provide an explanation for his absence.  See Third Addendum at 1.  M.D. attended the rescheduled meeting with the USPO, but M.D. did not provide the documents.  See Third Addendum at 1.  The UPSO notes that M.D. has still not provided documents and has not returned the Declaration of Losses form the USPO provided to him.  See Third Addendum at 1.

The USPO contacted the UNMH, which confirmed that it billed M.D.'s two insurances, Blue Cross Blue Shield of New Mexico ("BCBS") and the Department of Human Services Behavioral Health Fallen Colors ("DHS Fallen Colors"), for $6,324.78, and the two insurances

---

[4]The Third Addendum for Loren Sabaquie, filed February 4, 2019 (Doc. 170), and the Fourth Addendum for Bruce  Sedillo, filed February 4, 2019 (Doc. 168), are identical to the Third Addendum to the Presentence Report for Robert Gallardo on February 4, 2019 (Doc. 169), and thus the Court refers to them collectively as the "Third Addendum."

The USPO filed a Third Addendum to the Presentence Report for Bruce Sedillo on October 9, 2018 (Doc. 136)("Sedillo Third Addendum").  The Third Addendum explains that the United States had not filed Objections to the PSR.  See Third Addendum at 1.  The Third Addendum states that Sedillo emailed the UPSO and asked for additions to the PSR.  See Third Addendum at 1. The Third Addendum does not state what these additions are, but the Court presumes that they are the items listed under "Response by U.S. Probation Office": (i) Sedillo's New Mexico High School Equivalency Credential; and (ii) an October 3, 2018 nolle prosequi and an October 4, 2018, order to quash a bench warrant, both filed in case number "D-1314-CR-201600272."  See Third Addendum at 1.

covered the majority of M.D.'s expenses.  Third Addendum at 1-2.  The UPSO learned that there

is a $200.00 outstanding bill, but no entity could clarify who is to pay the bill, and that M.D. paid

a total of $79.05 for the co-pay and additional uncovered charges.  See Third Addendum at 2.  The

UPSO contacted both BCBS and DHS Fallen Colors, but BCBS did not return its call and DHS

Fallen Colors stated that the USPO would need to comply with Inspection of Public Records Act

to obtain documents and that DHS Fallen Colors generally does not seek restitution.  See Third

Addendum at 2.  Age to Age Counseling confirmed that M.D. had not paid out-of-pocket for its

services and that it would not be seeking restitution or payment for M.D. for an outstanding bill of

$75.00.    Finally, the USPO contacted Cellco Partnership, which manages Verizon Wireless'

payroll, but M.D. did not sign a release for USPO to access his documents and Cellco Partnership

had not yet answered the USPO's request that it waive the access fee.

The UPSO emphasizes that it has underscored the importance of restitution documentation

to M.D., but that M.D. has not provided the required information.  See Third Addendum at 2.  Thus,

the information that the USPO was able to obtain indicates that insurance has paid for M.D.'s

medical expenses.  The USPO concludes that M.D. is entitled to $79.05 for out-of-pocket

expenses.  See Third Addendum at 2-3.

### [4].    The Sentencing Hearings.[5]

The Court excerpts the Sentencing Hearings from its The Court held
Sabaquie's sentencing hearing first, on September 20, 2018.  See Clerk's Minutes,
filed September 20, 2018 (Doc. 124).  At the hearing, Plaintiff United States of
America explained that it has "had a difficult time communicating with some of
the . . . witnesses[,] because they've left their employment and so forth."  Draft
Transcript of Hearing at 39:5-7 (taken September 20, 2018)(Torrez)("Sabaquie

---

[5]The Court excerpts this portion of the Procedural History from its Memorandum Opinion
and Order, No. CR 17-1371 JB, 2018 WL 6650135 at *1-4 (D.N.M. Dec. 19, 2018).

Tr.").[6]  The United States reiterated the facts recounted in the Second Addendum, see Sabaquie Tr. at 39:15-20 (Torrez), and, given these facts, asked the Court to "keep the matter of restitution open for 90 days under the statute with respect to Mr. Sabaquie," Sabaquie Tr. at 39:20-22 (Torrez).  The United States noted that remembering that armed robberies impact individuals' and communities' safety is important.  See Sabaquie Tr. at 39:22-25 (Torrez).  In response to the Court's question, the USPO indicated that, by the sentencing hearing, it had not been able to obtain information from the victims for restitution.  See Sabaquie Tr. at 51:6-14 (Court, Probation Officer).  The Court stated, accordingly, that it would not order restitution, as the victims had not made a claim.  See Sabaquie Tr. at 51:15-20 (Court).  The United States responded by noting that 18 U.S.C. § 3664(d)(5) provides ninety days after sentencing to address restitution under the MVRA and stated that it would seek further information on the matter.  See Sabaquie Tr. at 52:20-25 (Torrez).  The Court explained that, to postpone addressing restitution, it needed representations from the United States or the USPO that a restitution amount could not be determined through their "reasonable efforts" ten days before the sentencing hearing.  Sabaquie Tr. at 53:3 (Court).  See id. at 53:1-6 (Court); id. at 55:3-10 (Court).  Sabaquie contended that he could not determine whether the United States and the USPO required additional time to obtain information on restitution, what had delayed M.D. in providing information on restitution, or whether M.D. could overcome the obstacle within the ninety days.  See Sabaquie Tr. at 53:19-25 (Fernandez).  The Court read from 18 U.S.C. § 3664(d), stating that the victim's losses must be unascertainable by ten days before sentencing for the Court to postpone determining restitution ninety days after sentencing and asked whether the USPO could make this representation.  See Sabaquie Tr. at 55:3-10 (Court).  The United States replied that it had made efforts to obtain such information and that the victim intended to submit information on restitution, see Sabaquie Tr. at 53:7-12 (Torrez), and the USPO affirmed that it could not have determined the restitution amount by ten days before sentencing.  See Sabaquie Tr. at 55:11-12 (Probation Officer).  The Court indicated that it would have a restitution hearing "no more than 90 days" from the sentencing hearing.  See Sabaquie Tr. at 55:13-14 (Court).  According to the Court, if, at that time, the victim produces no information, the Court will not order restitution, but if the victim does produce information, Sabaquie can look at the information and consider whether the United States and the USPO could have learned it earlier.  See Sabaquie Tr. at 55:15-24 (Court).  The Court noted that, if M.D. did not cooperate with the United States or the USPO, the United States and the USPO would struggle to get the information. See Sabaquie Tr. at 55:25-55:8 (Court).  The Court indicated that the USPO had

---

[6]The Court's citations to the transcripts of the hearings cited in the text, the Draft Transcript of Hearing (taken October 3, 2018), the Draft Transcript of Hearing (taken October 10, 2018), [] the Draft Transcript of Hearing (taken December 17, 2018), [and the Draft Transcript of Hearing (taken March 21, 2019),] refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

made multiple efforts to get the information, so the USPO at least could make representations that it had tried to obtain the information. See Sabaquie Tr. at 56:2-8 (Court); id. at 56:12-15 (Court). The United States replied that it did not get any information about possible restitution until it received the addendum about medical costs. See Sabaquie Tr. at 56:9-11 (Torrez).

The Court held Gallardo's sentencing hearing on October 3, 2018. See Clerk's Minutes, filed October 3, 2018 (Doc. 133). The United States reiterated that it was seeking restitution for M.D. See Draft Transcript of Hearing at 25:1-2 (taken October 3, 2018)(Torrez)("Gallardo Tr."). The Court initially noted that it would not impose restitution, as M.D. had not made a claim. Gallardo Tr. at 31:22-32:2 (Court). The United States requested that the Court "hold the matter of restitution open" for ninety days as it did in Sabaquie's sentencing hearing. Gallardo Tr. at 32:25-33:3 (Torrez). The Court asked whether the USPO could have reasonably determined a restitution amount and whether M.D. had submitted information for a restitution claim, and the USPO indicated that the victim expressed "some interest in wanting" a restitution claim but had not submitted information. Gallardo Tr. at 33:9-10 (Probation Officer). See Gallardo Tr. at 33:4-14 (Court, Probation Officer). The Court indicated that it would set a hearing on restitution within ninety days of the hearing and for the same time as Sabaquie's hearing on restitution. See Gallardo Tr. at 33:16-22 (Court).

The Court held Sedillo's sentencing hearing on October 10, 2018. See Clerk's Minutes, filed October 10, 2018 (Doc. 140). The United States requested that the Court "hold [the] matter of restitution open for the remainder of time that remains as we did with the other co-defendants." Draft Transcript of Hearing at 21:11-13 (taken October 10, 2018)(Torrez)("Sedillo Tr."). The Court asked whether the USPO could determine restitution ten days before the sentencing hearing, and the USPO responded that it had contacted M.D., but that M.D. had not provided documentation about restitution. See Sedillo Tr. at 21:14-21 (Court, Probation Officer). The Court indicated that it would set a hearing in Sedillo's, Sabaquie's, and Gallardo's cases within ninety days, and that, if by that date, M.D. provides figures for restitution, the Court will determine whether to order restitution. See Sedillo Tr. at 21:22-22:7 (Court).

On October 10, 2018, the Court scheduled a restitution hearing for December 12, 2018. See Notice of Hearing, filed October 10, 2018 (Doc. 142). December 12, 2018, is eighty-three days after Sabaquie's September 20, 2018, hearing.

### [4].   The Motion.

The United States filed the Motion, arguing that the Court grant it "an additional 60 days to obtain" and review medical billing records. Motion at 1. The United States explains that it "has made several attempts to obtain the information

necessary to inform the Court of what the restitution should be," and that the United States has met with and communicated with M.D. and attempted to obtain his medical billing records.  Motion at 1.  The United States states that it has not received the medical billing records and that it requires those records to "determine future medical costs and past medical costs."  Motion at 1.  The United States notes that Gallardo does not object to the continuance but neither Sedillo nor Sabaquie have responded to the Motion.  See Motion at 1-2.

### [5].   **The Status Hearing.**

Because Gallardo was not present in the courtroom but remained in custody outside the state of New Mexico, the Court began the hearing by inquiring whether the hearing could proceed without Gallardo's presence.  See Draft Transcript of Hearing 3:7-21 (taken December 17, 2018)(Herrera, Court)("Restitution Hearing Tr.").  The Court clarified that, although close to ninety days had passed since Sabaquie's sentencing hearing, the Court had reached only the middle of the ninety days since Gallardo's sentencing hearings.  See Restitution Hearing Tr. at 3:16-21 (Court).  Gallardo indicated concerns with proceeding with the Restitution Hearing, because the United States had noted that they did not have the documents necessary to establish a restitution amount and, according to Gallardo, without that, the parties could not meaningfully discuss the restitution amount.  See Restitution Hearing Tr. at 3:22-4:7 (Herrera).  The Court noted that it would prefer to proceed with the Restitution Hearing when Gallardo will be present and that the United States has the responsibility for ensuring the Defendants' presence in the courtroom.  See Restitution Hearing Tr. at 4:8-14 (Court).

The United States indicated that it had received some information, including medical records, from M.D. but that M.D. had not yet provided the United States his medical billing records.  See Restitution Hearing Tr. at 4:15-22 (Torrez).  The United States requested, accordingly, another sixty days to obtain the information for restitution, including medical billing records, tax records, and information about M.D.'s lost wages.  See Restitution Hearing Tr. at 4:22-5:3 (Torrez).  The Court asked under what authority it could grant the United States sixty days to obtain such information, and the United States cited Dolan v. United States, 571 F.3d 1022 (10th Cir. 2009).  See Restitution Hearing Tr. at 5:4-10 (Court, Torrez).  The United States argued that Dolan v. United States stands for the proposition that a court has authority to make a restitution determination after the ninety-day deadline if the court indicates "prior to the deadline" that it will order restitution and leaves "open for more than 90 days only the amount."  Restitution Hearing Tr. at 6:10-17 (Torrez).  Torrez requested that, given this case, the Court order restitution "without a final amount" and give the United States sixty days to determine the restitution amount.  See Restitution Hearing Tr. at 6:18-22 (Torrez).  The Court indicated that the Supreme Court of the United States affirmed Dolan v. United States in United States v. Dolan, 560 U.S. 605 (2010), but that the Supreme Court adopted a

narrower analysis than the Court of Appeals for the Tenth Circuit.  See Restitution Hearing Tr. at 6:5-9 (Court).

The Court expressed concern about ordering restitution without Gallardo's presence and asked for Gallardo's opinion about ordering restitution at the Restitution Hearing and determining the restitution amount later when Gallardo was present.  See Restitution Hearing Tr. at 6:23-7:5 (Court).  Gallardo expressed concern about the Court ordering restitution, because the United States had not provided even medical billing records from which to determine the restitution amount's size.  See Restitution Hearing Tr. at 7:6-15 (Herrera).  The United States explained that M.D.'s PTSD might be causing the difficulties in obtaining M.D.'s responses and that the United States had had similar problems working previously with "an individual that suffered a disability," Restitution Hearing Tr. at 8:8 (Torrez); according to the United States, with the previous victim, the United States required a year to obtain the desired information.  See Tr. at 8:3-13 (Torrez).  The United States offered that it could subpoena the medical billing records and provide M.D. for cross-examination.  See Restitution Hearing Tr. at 8:13-18 (Torrez).  The Court offered to set a hearing on December 19, 2018, the ninetieth day after Sabaquie's sentencing, to further consider the issue.  See Restitution Hearing Tr. at 8:22-25 (Court).  Sabaquie acquiesced to this plan with the condition that, before the hearing, the United States provide any documents it obtained.  See Restitution Hearing Tr. at 9:15-20 (Fernandez).  In response to the Court's question whether the United States agreed to this request, the United States agreed to provide Sedillo, Sabaquie, and Gallardo any documents recovered before the hearing.  See Restitution Hearing Tr. at 10:22-25 (Court, Torrez).  The Court noted that Gallardo should be present in the courtroom for the December 19, 2018, hearing.  See Restitution Hearing Tr. at 12:3-5 (Court).  The United States offered that, if it could obtain the medical billing records it would try to arrive at a restitution amount before December 19, 2018, and the Court replied that, if the United States read Dolan v. United States correctly and the Court could permissibly follow the two-step process of ordering restitution before the ninety-day deadline and determining the restitution amount after the ninety-day deadline, the Court would order restitution on December 19, 2018, and grant the United States another sixty days to determine the restitution amount.  See Restitution Hearing Tr. at 13:9-23 (Torrez, Court).

6.      **The March 21 Hearing.**

At the March 21, 2019, hearing, the Honorable Steven Yarborough, United States Magistrate Judge for the United States District Court for the District of New Mexico, first explained that, although he would handle the hearing, the Court would make the final decision. See Draft Transcript of Hearing at 3:14-20 (taken March 21, 2019)(Yarborough)("March 21 Tr.").

Magistrate Judge Yarborough began the proceedings by calling the United States' first witness,

Edward Raymond Street, to the stand.  See March 21 Tr. at 5:9-10 (Yarborough).  Street confirmed

that the United States asked him to investigate and evaluate M.D.'s lost-wages claim.  See March

21 Tr. at 6:1-4 (Street).  He briefly described his background -- a graduate of South Dakota State

University, a University of New Mexico accounting student for an unspecified period of time, a

certified public accountant since 1981 who is licensed in both New Mexico and Colorado, and a

member of the American Institute of Certified Public Accountants and the New Mexico Society

of Certified Public Accountants.  See March 21 Tr. at 6:20-22 (Street).  He stated that he has

specialized "training and continuing education to obtain the certified and financial forensics

designation, and also the designations of certified valuation analyst and related designation in

valuation, which include accredited and business valuation and the accredited senior appraiser."

March 21 Tr. 6:25-7:1 (Street).  Street asserted that he has served as an expert in federal court,

bankruptcy court, and state district courts.  See March 21 Tr. 7:12-14 (Street).  He noted that he

was an expert due to his public accountant certification in all of those cases, and in some of those

cases he was an expert due to his financial forensics certification.  See March 11 Tr. at 7:15-21

(Street).  Upon the United States' request and without any objection from defense counsel,

Magistrate Judge Yarborough designated Street as an expert as a certified public accountant.  See

March 21 Tr. at 7:25-8:9 (Torrez, Herrera, Fernandez, Yarborough).

Street explained that he conducted his analysis with the following documents: an

attendance record from September 7, 2017, through December, 2018; a 2017 W-2; a 2018 W-2;

and the hours and earnings reports from two pay periods.  See March 21 Tr. at 8:14-18 (Street).

From the attendance records, Street was able to discern that M.D. worked until March 26, 2018,

stopped working, then started working again in November, 2018.  See March 21 Tr. at  9:1-7

(Torrez, Street).  Street also calculated that M.D. was paid $8,002.56 for the period of March 26,

2018, to July 14, 2018.   See March 21 Tr. at 9:18-10:1 (Street).   Thus, M.D. was being paid at a

rate of sixty-percent of his normal pay during that period.   See March 21 Tr. at 12:1-3 (Street).

Street concluded that, from July 14, 2018 to November, 2018, M.D. was classified as taking unpaid

absence, although there "was an increase in compensation that's described as miscellaneous pay"

during that time period. March 21 Tr. at 10:2-16 (Torrez, Street).   Torrez notes that the

miscellaneous pay increased by $4,136.96 and that "there were other differences in the different

pay categories which totaled $147.53."  March 21 Tr. at 10:16-21 (Street).  M.D. reported that the

miscellaneous pay was for his bonus, "which may have been a quarterly bonus amount earned

prior to the period that he was not working."  March 21 Tr. at 14:4-7 (Street).  Street noted that

M.D. and documentation support that M.D. did not receive any workmen's compensation.  See

March 21 Tr. at 11:9-12 (Street).  He then described his method to determine wage loss, which

was to take the amounts from box three[7] of M.D.'s 2017 and 2018 W-2s, which are the full amounts

of compensation before deduction or deferral.  See March 21 Tr. at 11:23-25 (Street).  Street then

explained that he calculated M.D.'s lost wages for 2018 as $22,693.06.  See March 21 Tr. at 12:4-

5 (Street).  He used a second method to calculate M.D.'s lost wages, in which he

> multiplied the hourly rate of pay for MD, which was $20.84, times the standard
> hours per week of 40 hours, times the number of weeks that MD was not actively
> working.  And then from those amount, [he] subtracted the short-term disability
> amount received for the period from March 26, 2018, through July 14, 2018.

March 21 Tr. at 12:11-17 (Street).  He then

> calculated estimated lost commissions, which was calculated at the base monthly
> commission amount of $1,225 times the estimated number of months not earned
> for April through October 2018 of seven months.  That indicated total estimated

---

[7]On a W-2 Form, box three is labelled "Social security wages."

lost commissions of $8,575. And to that [he] added the net lost regular pay of $18,
255.84.

March 21 Tr. at 13:1-8 (Street). Using the second method, he arrived at a sum of $26,830.84. See
March 21 Tr. at 13:8-9 (Street). He explained that he used $1,225.00 for the commission, because
that was the base monthly commission rate, and M.D. stated that he usually received at least the
base monthly commission rate. See March 21 Tr. at 13:11-15 (Street). Street opined that the larger
sum of $26,830.84 was likely more accurate than the smaller sum, because M.D.'s hourly rate
increased the longer he was employed, and the second method of calculation took that increase
into consideration. See March 21 Tr. at 14:13-20 (Street, Torrez).

Sabaquiae objected to the United States' Exhibit 3, which is Street's report to which he
testified. See March 21 Tr. at 15:12-14 (Fernandez). He objected, because the report "was created
for the purpose of litigation," and, thus, there is no exception to hearsay, and because the report is
cumulative. March 21 Tr. at 15:14-22 (Fernandez). Gallardo joined the objection. See March 21
Tr. at 15:24-25 (Herrera). Magistrate Judge Yarborough provisionally admitted the exhibit, with
the caveat that the Court would decide on its admissibility later. See March 21 Tr. at 16:1-9
(Yarborough). The United States noted that the standard for this hearing is a preponderance-of-
the-evidence standard, that the USPO has seen Exhibit 3, and that the hearsay rule does not apply
to "this particular proceeding." March 21 Tr. at 16:10-19 (Torrez).

Sabaquiae began his cross-examination of Street by asking whether Street's analysis relied
on assumptions. See March 21 Tr. at 17:10-14 (Fernandez). Street confirmed that the United
States asked him to assume that M.D. was not able to work, because of medical issues, from March
26, 2018 to October 31, 2018, and that M.D. returned to work on November 1, 2018. See March
21 Tr. at 17:15-19 (Fernandez). The United States objected, stating that questions to Street

regarding whether he made an independent determination of M.D.'s work record were irrelevant, because "the connection between [the amount of restitution] and why Mr. MD did not work was the subject matter of the December 17th hearing." March 21 Tr. at 18:8-14 (Torrez). Magistrate Judge Yarborough concluded that Sabaquiae could ask questions about what Street considered in making his determination, with the understanding that Sabaquiae's questions were not intended to revisit information already reviewed at the December 17 hearing. See March 21 Tr. at 20:5-11 (Yarborough). Street then confirmed that he made his determination without eight months of M.D.'s 2017 attendance records. See March 21 Tr. at 19:25-2 (Fernandez, Street). Sabaquiae then inquired into Street's first method of calculation, and Street confirmed that he subtracted the number in the 2018 W-2's box three from the number in the 2017 W-2's box three to arrive at $22,693.00. See March 21 Tr. at 20:3-13 (Fernandez, Street). Street took issue with Sabaquiae's characterization that this "indication of loss of earnings in 2018 versus 2017" was calculated "by just taking one number, wages and tips in one year, minus the wage, and tips from the other year"; Street asserted that the calculation was "based on [his] discussions with M.D." that M.D. was unable to work for a specific period of time in 2018, the attendance record supporting M.D.'s statement that he was unable to work for that period of time in 2018, and the pay stubs from that period of time in 2018 that showed that Verizon Wireless was not regularly compensating M.D. March 21 Tr. at 20:24-21:9 (Street). Street stated that, although there was some increase in base pay from year to year, possible "changes in the bonus arrangements" could have mitigated that increase. March 21 Tr. at 21:15-21 (Fernandez, Street). Street agreed with Sabaquiae that M.D.'s base pay for 2017, if reached by multiplying 2,080 hours by $20.84/hour, would be $43,347.20, but Street declined to adopt that as M.D.'s base pay, because Street did not know if M.D.'s 2017 hourly rate was $20.84. See March 21 Tr. at 22:12-19 (Street, Fernandez)(stating that M.D.'s

hourly rate increased over time to reach $20.84 in 2018).  Street confirmed that M.D.'s 2017 pay
was $59,579.36, which is $16,232.16 more than $43,347.20, the hypothetical 2017 base salary.
See  March 21 Tr. at 23:4,8 (Street).  Street stated that his discussions with M.D. support the
hypothesis that the $16,232.16 increase was a result of monthly bonuses and quarterly bonuses,
see March 21 Tr. at 23:13-17 (Street), although he admitted that his only information about the
bonuses and base commissions comes from M.D, see March 21 Tr. at 23:21-24:2 (Fernandez,
Street).

     Sabaquiae highlighted Exhibit 5, M.D.'s paystub dated from November 4, 2018, to
November 17, 2019, which Street confirmed gave no indication that M.D. received commission
during that time period, even though M.D. worked during that period.  See March 21 Tr. at 24:3:-
18 (Fernandez, Street).  Sabaquaie noted that the paystub lists M.D.'s year-to-date commissions
as $3,902.40,  see March 21 Tr. at 24:24 (Fernandez), the same total as the commissions listed on
Exhibit 4, see March 21 Tr. at 25:10 (Fernandez).  Street confirmed "that between July 14, 2018,
and November 17, 2018, no commissions were added that were classified in the line that's
described as commissions."  March 21 Tr. at 24:15-18 (Street).  Sabaquaie asked whether Street
is qualifying this statement, because Street believed "that commissions were added that's not
captured in the year-to-date commissions."  March 21 Tr. at 24:19-21 (Street).  Street clarified that
he qualified the statement, because the pay stubs list approximately twelve different categories of
pay, including categories entitled commissions, absence commissions, miscellaneous pay, and
quarterly commission bonus, and because Sabaquaie asked Street only about the line labelled
"commissions."  March 21 Tr. at 25:22-26:7 (Street).  Street refused to agree with Sabaquaie's
statement that "nothing in the pay stub corroborates" M.D.'s statement that his base commissions
totaled $1,225.00; Street instead noted that, although there is nothing corroborating that specific

amount, "there's clearly some compensation paid in addition to base compensation,"  because the total compensation amount for 2017 is higher than the base compensation amounts for 2017 and the total compensation, including commissions, for 2018.  March 21 Tr. at 26:21-27:3 (Fernandez, Street).

In response to Sabaquaie asking Street to confirm that M.D. was paid 1.5 times his normal rate for overtime work, Street noted that Exhibit 6 states that the overtime rate is 1.5 times the normal rate, but the actual overtime payment indicates Street only received $22.02, which is $1.18 more than his normal hourly rate.  See March 21 Tr. at 27:17-28:3 (Fernandez, Street).  Although Street confirmed that, because he thinks the base rate calculation is correct, there is an unknown issue with the overtime paid information.  See March 21 Tr. at 28:20-25 (Street)(noting that, in Street's experience as CPA, overtime pay is generally 1.5 times the amount of normal hourly pay).  Street confirmed that Exhibit 5 -- M.D.'s paystub dated from November 4, 2018, to November 17, 2019 -- lists the overtime pay rate as $31.26, which is 1.5 times M.D.'s normal hourly pay.  See March 21 Tr. at 31:6-14 (Fernandez, Street).  Street also confirmed that Exhibit 5 lists the holiday rate as 1.5 times the normal hourly rate, although he questioned whether the data entry for 0.12 hours of holiday pay is correct.  See March 21 Tr. at 32:12-15 (Street).  Street further clarified that M.D. worked Sunday for a thirty-five percent premium for 38.21 hours and a total of $251.38.  See March 21 Tr. at 32:23-25 (Street).  Street agreed with Sabaquaie that Street does not know how many overtime, holiday, or Sunday hours Street worked in 2017, and thus Street does not know how much the difference in pay between 2017 and 2018 can be attributed to overtime, holiday, or Sunday premium pay.  See March 21 Tr. at 33:3-10 (Fernandez, Street).

In response to Sabaquaie's question whether M.D. could have made approximately $16,000.00 in 2017 to work an additional ten hours per week at a premium rate, Street stated that

"'yes' would not be a complete and accurate answer to that question," because M.D.'s conversations with Street indicate that it is unlikely that M.D. would work the additional hours but not be performing at a high enough level to receive commissions.  March 21 Tr. at 36:23-37:9 (Fernandez, Street).  Sabaquaie reiterated that Street does not have the following information: (i) the dollar amount of M.D.'s 2017 commissions; (ii) M.D.'s base commission rate in any month beyond what M.D. conveyed to Street; and (iii) whether M.D. worked an unusual amount of overtime, holiday, or Sunday hours during 2017.  See March 21 Tr. at 39:11-40:1 (Fernandez, Street).  Street said that he made his calculations without knowing M.D.'s 2016 compensation, but Street clarified that M.D's 2016 compensation is not "absolutely necessary" for Street's calculations.  March 21 Tr. at 40:6-19 (Fernandez, Street).  Street confirmed that he made his base pay calculations assuming a five-day work week.  See March 21 Tr. at 42:15 (Street).  Sabaquaie turned to the Government' Exhibit 3, which indicates that M.D. worked six days in a row on more than one occasion -- October 5, 2017, through October 10, 2017, and November 3, 2017, through November 8, 2017. See March 21 Tr. at 41:5 (Fernandez); id. at 42:1-11 (Fernandez, Street); id. 42:17-19 (Fernandez, Street).  Street confirmed that, in November 15, 2017, through November 27, 2017, M.D. took two vacation days off and may have had one paid holiday day off.  See March 21 Tr. at 43:4-15 (Street).  Street also confirmed that Exhibit 5 evidences that M.D. received compensation for working on a holiday.  See March 21 Tr. at 44:7-12 (Street).  Street stated that the paystubs do not clarify, for at least some of M.D.'s 2017 and 2018 employee attendance sheets, whether certain holidays were paid as an employee benefit or whether M.D. received payment for working on those holidays.  See March 21 Tr. at 44:25-45:13 (Fernandez, Street).  Sabaquaie wondered whether, because Street's calculation was based on M.D. working five days a week and M.D. sometimes worked more than five days in a week, and because it is unknown how M.D. was

compensated for holidays, Street can know what made the difference between the calculated base pay of $42,000.00, and M.D.'s total compensation of $59,000. See March 21 Tr. at 45:14-46:3 (Fernandez, Street). Street speculated that Sabaquaie is "jumping to conclusions in some regard," because the five-day workweek may just be five days in a seven-day period, and not necessarily Monday through Friday with weekends off. March 21 Tr. at 46:4-5 (Street). See id. at 47:4-8 (Street). In response to Sabaquaie's question whether the base monthly commission rate of $1,225.00 comes only from M.D., Street noted that, in January 2018, through March 2018, M.D. earned $3,902.40 in commissions, which is approximately $1,300.00 per month. See March 21 Tr. at 47:14-21 (Street). He acknowledges that M.D. did not receive any additional commission when he worked during November 4, 2018, through November 17, 2018, but Street noted that the monthly commission may be paid at the end of the month. See March 21 Tr. at 47:22-48:5 (Fernandez, Street). He also acknowledged that M.D. could have incorrectly stated that he received commissions, and that, instead, M.D. may not have received commissions or received a different pay that he is misrepresenting as commissions pay. See March 21 Tr. at 48:19-24 (Fernandez, Street). Street noted, however, that, based on the list of training courses M.D. took, the positive comments that M.D.'s supervisor gave M.D., and M.D.'s representations to Street, Street does not think M.D.'s representation of his 2017 base commission is "unreasonable." March 21 Tr. at 48:18 (Street). See id. at 48:9-18 (Street).

Street acknowledged that he consulted a workman's compensation letter that the United States provided to him, but he denied excluding it from his report, because it said that no workman's compensation was given to M.D. See March 21 Tr. at 49:2-49:20 (Street). Street confirmed that all of the calculations he discussed at the hearing were about gross pay and that some portion of M.D.'s 2017 gross pay was transferred to his employee-based retirement account.

See March 21 Tr. at 50:6-22 (Fernandez, Street).  Street noted that, if M.D. was paid additional compensation in 2018, but kept his employee deferral rate at a similar percentage, there would have been additional amounts taken out as employee deferrals in 2018.  See March 21 Tr. at 51:2-6 (Street).  Sabaquaie pointed to Exhibits 2 and 3, which are M.D.'s 2017 and 2018 W-2 forms, and noted that the 2017 W-2 shows that $11,796.00 in employee deferrals was taken out of M.D.'s gross pay.  See March 21 Tr. at 51:12-15 (Fernandez); id. at 51:19-21 (Fernandez).  Street stated that the 2018 W-2 shows that $637.72 was removed in deferrals from M.D.'s gross pay, and the 2017 W-2 shows that $887.23 was removed in deferrals from M.D.'s gross pay.  See March 21 Tr. at 52:10-17 (Street).  Street acknowledged that his uncertainty whether box 12B[8] on the W-2s refers to employer-provided health care insurance.  See March 21 Tr. at 53:13-20 (Street, Fernandez).  Street noted that, although an employee takes home only his or her net pay, money removed from gross pay for an employee's deferral to a retirement plan is money the employee will take home at a later point.  See March 21 Tr. at 54:12-18 (Street).  Moreover, Street says, other deductions, such as child support payment, may be removed from the gross pay but still could be considered take-home pay for the family.  See March 21 Tr. at 54:19-23 (Street).

Street confirmed that, based on documents he saw and his discussions with the United States, he believed that M.D. was paying child support payments, and he believes that he saw a withholding for child support.  See March 21 Tr. at 55:1-9 (Street).  Street explained that he had one formal meeting with M.D. that lasted about two hours, in which Street reviewed documents that the United States provided to him.  See March 21 Tr. at 57:7 (Street); id. at 57:12-13 (Street).  He stated that the documentation he obtained from the United States before and at the meeting are

---

[8]The W-2 instructions state that box 12B is for "uncollected Medicare tax on tips."

the only documents that he has pertaining to M.D.'s compensation and that he did not request any

additional documents.  See March 21 Tr. at 58:2-6 (Herrera).  Street reiterated that, although

documents related to M.D.'s 2016 compensation could have been helpful in Street's calculations

to look at trends, he cannot say that the 2016 documents would have resulted in "a more exacting

figure."  March 21 Tr. at 58:14-20 (Street, Herrera).  Street said that M.D. did not convey to Street

that Verizon Wireless had disciplined him, and M.D. conveyed to Street that M.D. did not have

any outside employment. See March 21 Tr. at 58:23-59:8 (Herrera, Street).

The United States conducted its redirect examination of Street, beginning by asking Street

to again look at Exhibit 4, the workman's compensation letter.  See March 21 Tr. at 59:15-16

(Torres).  Street confirmed that the letter indicates that the New Mexico's Worker Compensation

Administration received a request to conduct a record search for M.D. and that it was unable to

find records in its database pertaining to M.D.  See March 21 Tr. at 60:10-14 (Street).  Sabaquaie

objected, stating that there was no foundation for the document.  See March 21 Tr. at 60:21-61:1

(Fernandez).  See also id. at 62:1-2 (Herrera)(joining the objection).  The United States responded

that the document was obtained pursuant to a Rule 17 pursuant, so its evidentiary basis is that it is

a public record or a record kept in the course of business.  See March 21 Tr. at 61:7-11 (Torres).

Street characterized his wage loss estimate of $22,000.00, to be "conservative," because M.D.'s

hourly rate increased the longer that he worked at Verizon Wireless.  March 21 Tr. at 62:17-21

(Street).  Street then reiterated his belief that the difference in M.D.'s 2017 base pay and M.D.'s

actual 2017 compensation is largely related to bonuses, and not to overtime pay.  See March 21

Tr. at 63:13-16 (Street).  Street said that M.D. receiving $342.84 in holiday pay, $2.57 in holiday

worked premium pay, and $57.14 in holiday worked pay does not change Street's belief.  See

March 21 Tr. at 64:4-15 (Torres, Street).  He also said that the lack of 2016 documentation does

not change his calculation of lost wages.  <u>See</u> March 21 Tr. at 64:16-24 (Torres, Street).  He

estimated lost commissions to be $8,575 for seven months, which he notes is a "conservative"

estimate.  March 21 Tr. at 64:16-65:12 (Torres, Street). Finally, Street concluded that the total net

of lost wages and lost commissions for 31.5 weeks of work is $26,830.83, which is subject to the

increase in miscellaneous pay of $4,136.96 that may or may not be lost commissions.  <u>See</u> March

21 Tr. at 66:3-67:6 (Torres, Street).

## <u>LAW REGARDING RESTITUTION</u>

Courts do not have inherent power to order restitution, but may do so only when a statute

so authorizes.  <u>See</u> <u>United States v. Harwood</u>, 854 F. Supp. 2d 1035, 1051 (D.N.M.

2012)(Browning, J.)(citing <u>United States v. Gordon</u>, 480 F.3d 1205, 1210 (10th Cir. 2007)).  The

MVRA, 18 U.S.C. § 3663A, is a general act establishing a court's authority to order restitution.

<u>See</u> 3 C. Wright, A. Leipold, P. Henning, & S. Welling, <u>Federal Practice & Procedure: Criminal</u>

§ 546, at 241 (4th ed 2011)("3 C. Wright").  In the Tenth Circuit, restitution is not criminal

punishment, but is based "in the field of compensation and remediation."  <u>United States v.</u>

<u>Serawop</u>, 505 F.3d 1112, 1123 (10th Cir. 2007)(acknowledging that other Courts of Appeals treat

criminal restitution as a criminal penalty).

In 1996, Congress enacted the MVRA, which made restitution mandatory in certain cases,

"particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical

injury or pecuniary loss.'"  <u>United States v. Serawop</u>, 505 F.3d at 1117 (quoting 18 U.S.C.

§ 3663A(c)(1)).  The MVRA applies:

> **(c)(1)** . . . in all sentencing proceedings for convictions of, or plea agreements
> relating to charges for, any offense --
>
> > **(A)**     that is --

> > **(i)**   a crime of violence, as defined in section 16;
>
> > **(ii)**   an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;
>
> > **(iii)**   an offense described in section 1365 (relating to tampering with consumer products); or
>
> > **(iv)**   an offense under section 670 (relating to theft of medical products); and
>
> **(B)**   in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.
>
> **(2)**   In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

18 U.S.C. § 3663A(c)(1).

The MVRA envisions that, if the district court determines that difficulty in calculating restitution would complicate and prolong the sentencing process, the court may decline to order restitution; the MVRA provides:

> **(3)** This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that --
>
> > **(A)** the number of identifiable victims is so large as to make restitution impracticable; or
>
> > **(B)** determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3).  The term "victim" means

> a person directly and proximately harmed as a result of the commission of an offense as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 3663A(a)(2).

Section 3664 governs how courts are to issue and enforce restitution awards for the MVRA. See 18 U.S.C. § 3663A(d); 18 U.S.C. § 3556. Any dispute "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" and the "burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). See United States v. Serawop, 505 F.3d at 1117 (stating that the United States bears the burden of proving amount of loss under the MVRA). The burden of "demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents" is on the defendant. 18 U.S.C. § 3664(e). "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e).

Section 3664(a) requires that a court order the USPO to include in its presentence report "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a). If the USPO cannot "reasonably ascertain" "the number or identity of victims" or it is "clearly impracticable" to meet the requirements for other reasons, the USPO must "inform the court." 18 U.S.C. § 3664(a). The United States should provide the USPO a listing of the restitution claims sixty days before sentencing, but § 3664(d)(5) allows a court to "set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing," "if the victim's losses are not ascertainable by the date that is 10 days prior to sentencing." 18 U.S.C. § 3664(d)(5). "If the victim subsequently discovers further losses, the victim shall have 60 days

- 26 -

after discovery of those losses in which to petition the court for an amended restitution order." 18 U.S.C. § 3664(d)(5). A court may grant such an order "only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief." 18 U.S.C. § 3664(d)(5).

### ANALYSIS

The Court first rules on the Defendants' Objections made at the evidentiary hearing. See, e.g., March 21 Tr. at 15:12-14 (Fernandez). Determining that the Federal Rules of Evidence do not apply to the restitution hearing, the Court overrules the Objections. The Court next determines the appropriate restitution amount.

The first issue is whether to sustain Sabaquiae's Objections. Sabaquiae first objected to the United States' Exhibit 3, which is Street's report to which he testified. See March 21 Tr. at 15:12-14 (Fernandez). Sabaquiae, joined by Gallardo, alleged that, because Street "created [the report] for the purpose of litigation," the report is cumulative and does not fall under a hearsay exception. March 21 Tr. at 15:14-22 (Fernandez). See also March 21 Tr. at 15:24-25 (Herrera). In response, the United States argued that the hearing was subject to a preponderance-of-the-evidence standard, that the USPO has seen Exhibit 3, and that the hearsay rule does not apply to the hearing. See March 21 Tr. at 16:10-19 (Torrez). The Court agrees with the United States and overrules the Objection, because the Federal Rules of Evidence do not apply at sentencing hearings, and restitution is an extension of sentencing. See United States v. Ruby, 706 F.3d 1221, 1229 (10th Cir. 2013); U.S.S.G. § 6A1.3 cmt.

Sabaquiae, joined by Gallardo, also objected to a document within the United States' Exhibit 4 -- a State of New Mexico's Worker Compensation Administration letter that indicates that the entity was unable to locate records pertaining to M.D., because the document had no

foundation.  See March 21 Tr. at 60:10-14 (Street); id. at 60:21-61:1 (Fernandez); id. at 62:1-2

(Herrera)(joining the objection).  Even if the Court concluded that the Federal Rules of Evidence

applied to the restitution hearing, it would still overrule the Objection.   See United States v. Ruby,

706 F.3d at 1229.  The letter would qualify under rule 803(7) of the Federal Rules of Evidence,

which allows a lack of record to demonstrate that the occurrence had not happened.  Rule 803(7)

states

> **(7) Absence of a Record of a Regularly Conducted Activity.** Evidence that a
> matter is not included in a record described in paragraph (6) if:
>
> > **(A)** the evidence is admitted to prove that the matter did not occur or exist;

Fed. R. Evid. 803.  Thus, the Court admits the letter.

Turning to the amount of restitution owed, the Court conducts its own calculations.

Verizon Wireless paid M.D. sixty percent of his normal salary for March 26, 2018, through July

14, 2018.  See Second Addendum at 1.  The amount Verizon Wireless paid M.D. for that time

period is $8,002.56.  See Second Addendum at 1.  $8,002.56 is sixty percent of $13,337.60, which

would mean that one-hundred percent of M.D.'s pay for that time period would be $13,337.60, a

difference of $5,335.04.  Thus, M.D. is entitled to $5,335.04 in lost wages.

From July 14, 2018, to November 1, 2018, Verizon Wireless considered M.D. to be on an

unpaid leave of absence.  See March 21 Tr. at 17:15-19 (Fernandez).  The Court calculates that the

duration of that timeframe as approximately fifteen weeks and four days.  When making its

calculation, the Court did not include July 14, 2018, because July 14, 2018, was included in the

time period in which Verizon Wireless paid M.D. sixty percent of his salary.  Fifteen weeks of

salary at forty hours per week of work at $28.00 per hour is $16,800.00.  For the extra four days,

the Court does not know whether M.D. would have worked all four days or whether M.D. would

have had time off during those two days.  Thus, the Court elects to calculate lost wages for those

four days at fourth-sevenths M.D.'s weekly salary of $1120.00, which is $640.00.  Thus, M.D. is

entitled to the total of $16,800.00 and $640.00, which is $17,440.00.  The Court adds together the

initial $5,335.04 and the $17,440.00 to arrive at a total of $22,775.04.

       In terms of adding the bonus compensation to total wages, the Court concludes that it does

not have enough information to determine that it is more probable than not that M.D. received

quarterly bonuses.  While there is indication that M.D. received compensation over and above his

base salary, see March 21 Tr. at 14:4-7 (Street)(stating that M.D.'s miscellaneous pay "may" be

attributable to quarterly bonuses), there is not enough evidence for the Court to conclude that the

additional compensation is a quarterly bonus.  Street acknowledges that the only information he

has about quarterly bonuses comes from M.D., which while not determinative.  See March 21 Tr.

at 23:21-24:2 (Fernandez, Street).  Further, even if additional money was from bonuses and not

from overtime pay, commissions, or another source, the Court does not have any additional

information indicating the nature of these bonuses.  The bonus could have been a one-time bonus

from a program that does not exist or a biannual, not quarterly, bonus.  March 21 Tr. at 21:15-21

(Fernandez, Street)(acknowledging that "changes in the bonus arrangement" could explain

differences in yearly compensation).  The analysis is the same for commissions -- according to

Street's relaying of M.D.'s word, the monthly base commission was $1,225.00.  March 21 Tr. at

13:1-8 (Street).  The numbers do not seem to support that assertion.  Examining 2017

compensation, there was a $16,232.16 difference between M.D.'s base salary and his total salary.

See March 21 Tr. at 23:4, 8 (Street).  If the monthly base commission was the same between years,

base commission would account for $14,700.00 of that difference, leaving only $1,532.16 for four

quarterly bonuses, or $383.04.  Although the commission and bonus system may have changed,

considering the prior year's quarterly bonus amount of $383.04, the Court hesitates to conclude the miscellaneous pay increase of $4,136.96 can be explained by one quarterly bonus. See March 21 Tr. at 10:16-21 (Street).

Although the Court cannot discern from the evidence that M.D. received quarterly bonuses or monthly commissions of $1,225.00, it can discern that Street generally earned compensation above his salary. For 2018, it appears that he earned at least $4,136.96 during a period he was not working, so presumably that amount can be attributed to the prior months he worked. It is more probable than not, based on M.D.'s assertions and his past compensation, that the additional compensation is from a span of several months, and not from a single month. If it was for one quarter of the year, then it would total $16,547.84, which is close to the $16,232.16 difference between M.D.'s 2017 base compensation and 2017 total compensation. Thus, the Court concludes that it is more probable than not that, had M.D. been able to work March, 26, 2018, through July 14, 2018, he would have received some additional payment around the amount of the quarterly additional compensation. The Court will not conclude that the quarterly additional compensation is from bonuses, commissions, overtime pay, or holiday pay, because it has insufficient information to make that conclusion. It can, however, conclude that, in the three-and-one-half months that M.D. did not work, he would have more probably than not received similar additional compensation to the compensation he received for the past five quarters. Thus, the Court will award an additional $4,136.96 in lost wages. Combined, the Court has concluded that M.D. is entitled to $22,775.04 and $4,136.96, for a total of $26,912.00.

The Court, however, will deduct the short-term disability payment that M.D. received during his absence. That amount is $6,489.09, see Street Expert Report at 12, which leaves M.D. with restitution totaling $20,422.91. This number is between the two estimated amounts that Street

calculated, although it is less than the amount he recommended.  The Court also concludes that

M.D. is entitled to an additional $79.05 for out-of-pocket medical expenses and adds that amount

to the lost wages.  See Third Addendum at 2.  Thus, M.D. will receive $20,501.96 in restitution.

**IT IS ORDERED** that M.D. will be awarded restitution in the amount of $20,501.96.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

John C. Anderson
  United States Attorney
Presiliano Torrez
Howard R. Thomas
   Assistant United States Attorneys
District of New Mexico
Albuquerque, New Mexico

_Attorneys for the Plaintiff_

Daniel J. Tallon
Daniel J Tallon, Attorney at Law
Placitas, New Mexico

_Attorney for Defendant Bruce Sedillo_

Alejandro Benito Fernandez
  Assistant Federal Public Defender
Federal Public Defender Organization
Albuquerque, New Mexico

_Attorney for Defendant Loren Sabaquie_

Jerry Daniel Herrera
Albuquerque, New Mexico

_Attorney for Defendant Robert Gallardo_